ETHEL M. BELLOWS *vs.* WORCESTER STORAGE COMPANY.

Worcester.    September 22, 1936. — April 2, 1937.

Present: RUGG, C.J., CROSBY, FIELD, DONAHUE, & LUMMUS, JJ.

*Warehouseman. Evidence*, Presumptions and burden of proof, Extrinsic affecting writing, Competency. *Contract*, In writing. *Negligence*, Warehouseman, Bailee. *Proximate Cause.*

A contract in writing with a warehouseman providing for storage of goods in a certain warehouse which was not fireproof superseded a previous oral agreement under which the goods were to be put in another warehouse which was fireproof, and evidence of the oral agreement was rightly excluded.

In the absence of a demand under G. L. (Ter. Ed.) c. 105, § 15, the burden of proof, in an action of tort against a warehouseman for loss of goods, was on the plaintiff to prove negligence of the defendant causing the loss.

A warehouseman was not liable for the loss of goods stored with it caused by a fire deliberately set inside his warehouse by a person who had wrongfully entered through a defective door; the possible negligence of the warehouseman in failing to repair the door was not the proximate cause of the loss.

CONTRACT OR TORT. Writ in the Superior Court dated March 22, 1934.

The action was tried before *O'Connell*, J., who, after the recording of a verdict for the plaintiff in the sum of $609.80, ordered entered a verdict for the defendant under leave reserved. Both parties alleged exceptions.

*H. H. Hartwell*, (*R. W. Lewis* with him,) for the plaintiff.
*A. Houghton*, (*C. W. Wood* with him,) for the defendant.

LUMMUS, J. This is an action of tort for alleged negligence causing the loss by fire of household furniture and household goods stored in the Madison Street warehouse of the defendant. The jury returned a verdict for the plaintiff. On leave reserved under G. L. (Ter. Ed.) c. 231, § 120, the judge entered a verdict for the defendant, subject to the exception of the plaintiff. The main question is, whether the evidence warranted a verdict for the plaintiff. If it did not, the exception of the plaintiff to the refusal of the judge to give to the jury a requested instruction concerning the measure of damages becomes immaterial.

The remaining exception of the plaintiff may be disposed of at the outset. She introduced an envelope furnished by the defendant, evidently for the keeping of the warehouse receipt. On the back of the envelope were printed the words, evidently descriptive of one service rendered by the defendant, "Storage of Household Goods in Fireproof Buildings." She offered to prove that when the goods were stored it was orally agreed that they would be put in the fireproof warehouse of the defendant on Pleasant Street. But it was conceded that "some time" after the goods were actually stored in the Madison Street warehouse, which was not fireproof, the defendant mailed to the plaintiff in duplicate a warehouse receipt in a form constituting a written contract intended for the signatures of both parties. See G. L. (Ter. Ed.) c. 105, § 9. The defendant had already

signed.  The plaintiff, after reading the printed words on the back of the envelope, signed the contract and returned it to the defendant.  The contract plainly showed that the goods were stored in the Madison Street warehouse.  It is clear that the parties put their contract into a written form, by which both are bound.  The judge was right in excluding the offered evidence.

The decisive question is whether there is evidence of negligence of the defendant which caused the loss of the goods by fire.

The Madison Street warehouse was not fireproof, but was of "second class, slow burning, mill construction."  It was three stories in height, with outer walls of brick thirteen inches in thickness.  The interior was of heavy timbers, with wooden floors and partitions.  The building had been built nearly thirty years before for use as a storage warehouse.  There were forty-two windows, each provided with a tightly fitting wooden shutter covered with sheet metal.  These shutters were closed and fastened strongly at the time of the fire, except for a few that by arrangement with the fire department were left lightly fastened so that firemen could get in if necessary.  There was no night watchman, no sprinkler system, and no burglar alarm.  There was, however, an approved fire warning system, operated by electricity, consisting of wires along the ceilings with devices that would cause a short circuit, a ringing gong on the front of the warehouse, and a signal in the office of the American District Telegraph Company, in case the temperature should rise to one hundred forty-five degrees Fahrenheit.  The wires of this system ran through an instrument enclosed in a wooden case with a glass door in the office of the warehouse.  The key to this case was in the lock.  There was a fire department station less than a quarter of a mile away.  There was a loading door and another door in the front of the warehouse, and another loading door in the rear.  At the time of the fire in question, the gate at the street line was not locked, and anyone could walk around to the rear of the warehouse.  There was also a part of the rear line of the lot unfenced, and anyone could

have reached the rear of the warehouse over the lands of others.

The doorway at the rear of the warehouse was nine feet in height and in width, and its bottom was two and one half feet above the ground. The door was a little larger than the doorway. It was equipped on the top with wheels which ran on a metal track, so that the door could be pushed to one side, clear of the doorway. The door was blocked so that it could not be pushed inward as a whole. The door was securely locked at the time of the fire. The frame of the door was of pine, two and one fourth inches thick. There were six stiles and montants, from five and one half to seven inches wide. There were three rails, from seven to eleven inches wide. The foregoing showed on the outside of the door, and gave it the appearance of being panelled. Well nailed to this frame, on the inside, were tongued and grooved or "matched" boards, three fourths of an inch thick.

One Jewell, a muscular truckman of forty years, had frequented the warehouse for ten years, and knew it inside and out. He had the reputation of being honest, faithful and efficient. About eighteen months before the fire, the tailboard of his truck was accidentally backed into the rear door of the warehouse, loosening the matched boards and splitting two of them, in one of the lower panels, which panel was twenty-six inches in height and fourteen and one half inches in width. He helped the defendant's manager push the boards back in place. Thereafter, a person in the darkened warehouse looking at the door toward the daylight outside, could see two cracks in the matched boards of that panel, about ten inches long and one sixteenth of an inch wide, through which light showed. From the outside there was nothing to indicate upon ordinary observation any weakness in the door.

About six months before the accident to the door, Jewell had suffered a fracture of the skull and an injury to the neck. Later he "had trouble with his head." For two weeks before the fire he had been drinking heavily, and during that period he had set a number of fires in different

buildings, as he testified at the trial. But there is no evidence that any of these facts were known to the defendant or anyone else. So far as the bill of exceptions shows, his high reputation remained unimpaired. Shortly after the fire, however, he was arrested, examined by physicians, and confined in State institutions for the insane for four or five months before being discharged.

About nine o'clock on Saturday evening, February 24, 1934, when the temperature was at zero Fahrenheit or lower, and two or three feet of snow lay on the ground, Jewell was walking by the warehouse, and noticed that the gate was open. He remembered the injury to the door, and decided to try to get into the warehouse. He waded through the snow to the rear door. He applied his shoulder and his hands to the damaged panel until he made an opening that would admit him. Once inside, he went to the boiler room, where he remained a considerable time. He was in the warehouse in all about three hours. Going to the office, he removed all papers from the desk and threw them on the floor. He opened the door of the case containing the instrument of the fire warning system, and by pulling out some of the wires disabled it. He then lighted a match, set fire to the papers, and went out through the same opening by which he had entered.

The fire was discovered a few minutes later, and the fire department was summoned. The firemen were unable to reach the shutters that could have been opened easily, for the snow and ice caused the ladders to slip, and a down draft brought the smoke around them and made it dangerous to be up on the ladders long. The shutters that were more easily accessible were fastened too securely to be opened. The inability to open the windows impeded the firemen in fighting the fire. But if they could have been opened it is problematical whether the goods could have been saved. The warehouse burned almost completely, and the goods were destroyed.

G. L. (Ter. Ed.) c. 105, § 27, provides: "A warehouseman shall be liable for any loss or injury to the goods caused by his failure to exercise such care in regard to them as a

reasonably careful owner of similar goods would exercise; but not, in the absence of an agreement to the contrary, for any loss or injury to the goods which could not have been avoided by the exercise of such care." The statutory rule conforms to the rule existing at common law. "The legal obligation of the defendant was to use the ordinary care of the man of common prudence in keeping the kind of goods deposited with it, in view of the facts accessible to and likely to be considered and acted upon by a reasonable person before the event complained of." *Hecht* v. *Boston Wharf Co.* 220 Mass. 397, 403. *Stevens* v. *Stewart-Warner Speedometer Corp.* 223 Mass. 44, 46. *Rourke* v. *Cadillac Automobile Co. of Boston,* 268 Mass. 7, 8. *Doherty* v. *Ernst,* 284 Mass. 341.

There is here no evidence of a demand by the plaintiff as the holder of a warehouse receipt, under G. L. (Ter. Ed.) c. 105, § 15, and consequently the burden of showing a non-culpable loss as an excuse for nondelivery is not thrown upon the defendant, as it was in *Rudy* v. *Quincy Market Cold Storage & Warehouse Co.* 249 Mass. 492. See *National Dock & Storage Warehouse Co.* v. *United States,* 27 Fed. (2d) 4. Apart from that statute, the burden is on the plaintiff to prove a negligent loss. *Willett* v. *Rich,* 142 Mass. 356. *Hanna* v. *Shaw,* 244 Mass. 57, 61.

A number of the circumstances relied on by the plaintiff as indicative of negligence would not warrant a finding of negligence. The fact that the rear yard was not completely fenced had nothing to do with the loss. Leaving the front gate open made it possible for unauthorized persons to approach the building. But apart from the defect in the door they were unlikely to do harm. Closing and fastening the front gate would have prevented approach by the fire department in the more likely case of accidental fire. Negligence in leaving the front gate open could not have been found. The absence of metal doors may have increased the chance of fire from external causes; but here the fire was internal. There is nothing in the record to show that metal doors are intended or used as an improved means of keeping out trespassers. There was no negligence in having the

wires of the fire warning system run through an unlocked box in the office; it could hardly have been foreseen that anyone having access to the office would wish to disable the system. So far as the shutters were lightly fastened, that fact had nothing to do with the loss. So far as they were securely fastened, as they were on the lower story, that appears to have been a desirable precaution against intrusion, while shutters in the upper stories were so lightly fastened as to enable firemen, under ordinary circumstances, to remove them. At any rate, such shutters were in common use on warehouses, and were left fastened in the manner advised by the fire department. Had they been easier to open, it remains problematical whether the plaintiff's goods could have been saved. No one expressed an opinion that they could have been. No negligence could have been found with respect to the shutters. The absence of a sprinkler system was not negligent. The water damage resulting from sprinklers is often nearly as destructive to household goods as a fire. The absence of a night watchman and a burglar alarm does not seem to us to warrant a finding of negligence. There is little attraction to thieves in ordinary household furniture and household goods under the protection of a building such as the warehouse, and there is no substantial reason to expect an intruder other than one who comes to steal. It could not be found, in our opinion, that a man of ordinary prudence in caring for similar goods of his own would take such extreme precautions. Silks, furs, and other property of great value, easy portability, and ready market might require very different care. *Morse* v. *Homer's Inc.* 295 Mass. 606, 608, 609. *Ogden* v. *Aspinwall*, 220 Mass. 100, 105. There was no evidence that any of the precautions dealt with in this paragraph, the omission of which is relied on as showing negligence, were customary in storage warehouses containing goods of the class in question. *Corthell* v. *Great Atlantic & Pacific Tea Co.* 291 Mass. 242. *Engel* v. *Boston Ice Co.* 295 Mass. 428, 435. All these suggested grounds of liability seem to us merely to becloud the real issue.

We have left for consideration the failure to repair the

rear door after the accident in such a way that a strong
man knowing or discovering its weakness could not gain
entrance without the use of tools.    Whether that was neg-
ligence creating liability, depends upon the questions, first,
whether it was a "failure to exercise such care in regard to"
the plaintiff's goods "as a reasonably careful owner of sim-
ilar goods would exercise" (G. L. [Ter. Ed.] c. 105, § 27);
and, secondly, if it be found such a failure, whether it bore
sufficient causal relation to the loss of the goods by an
incendiary fire.

There can be no question that negligence may consist
in a failure to guard against the wrongful and even crim-
inal acts of third persons.    In *Sojka* v. *Dlugosz*, 293 Mass.
419, recovery was permitted against a father who left a
rifle accessible to his thirteen year old son and ought to have
foreseen his negligent use of it.    See also *Wheeler* v. *Dar-
mochwat*, 280 Mass. 553; *Morrison* v. *Medaglia*, 287 Mass.
46; *Woodman* v. *Haynes*, 289 Mass. 114; *Robinson* v. *Weber
Duck Inn Co*. 294 Mass. 75.    Am. Law Inst. Restatement:
Torts, §§ 302 (b), 303, 308.    In *Morse* v. *Homer's Inc*. 295
Mass. 606, a bailee was held liable for failure to guard
against a robbery, the likelihood of which ought to have
been foreseen.    See also *Marshall* v. *Caledonian Railway*,
1 Ct. of Sess. Cas. (5th Series) 1060, 36 Sc. L. R. 845;
*Brower* v. *New York Central & Hudson River Railroad*,
91 N. J. L. 190; *Garceau* v. *Engel*, 169 Minn. 62; *Pater-
son* v. *Norris*, 30 T. L. R. 393; *Hall* v. *Smathers*, 240 N. Y.
486; *Hines* v. *Garrett*, 131 Va. 125; *Austin W. Jones Co*.
v. *State*, 122 Maine, 214; *De la Bere* v. *Pearson, Ltd*. [1907]
1 K. B. 483; *Kuhlen* v. *Boston & Northern Street Railway*,
193 Mass. 341; *Dennis* v. *Clyde, New England & Southern
Lines*, 229 Mass. 502; Am. Law Inst. Restatement: Torts,
§§ 448, 449; Note, 78 Am. L. R. 471.

The ordinary household furniture and goods of the plain-
tiff were not in their nature especially attractive to a thief
who would have to break and enter a building in order to
get them and then cart them away.    *Morse* v. *Homer's Inc*.
295 Mass. 606, 608, 609.    *Ogden* v. *Aspinwall*, 220 Mass.
100, 105.    The defect in the door was not noticeable except

under unusual conditions, and did not afford a means of easy entrance. It could not have been foreseen that one of the very few men familiar with the defect would change from an honest, faithful and efficient person to one capable of breaking and entering the warehouse and doing an act of purposeless injury. We need not consider whether, with reference to any possible intrusion by means of the defective door and resulting harm, a recovery for negligence could have been had, because we are of opinion that even if there was negligence the loss of the goods was not, legally speaking, caused by such negligence.

It is true, that one who has negligently endangered another is not excused by the fact that the extent of the harm or the exact train of events by which it was produced could not have been foreseen. *Hill* v. *Winsor*, 118 Mass. 251. *Ogden* v. *Aspinwall*, 220 Mass. 100, 103. *Watkins* v. *New York, New Haven & Hartford Railroad*, 290 Mass. 448, 452. *Morse* v. *Homer's Inc.* 295 Mass. 606, 610. Am. Law Inst. Restatement: Torts, § 435. See also *In re Polemis and Furness, Withy & Co. Ltd.* [1921] 3 K. B. 560, discussed in Salmond, Torts (8th ed. 1934), 138, *et seq.*

But even a negligent defendant is not liable where "the causal connection between the original wrong of a defendant . . . and the ultimate harm . . . has been broken and . . . something so distinct . . . has thereafter happened as to constitute an intervening efficient, independent and dominant cause." *Wallace* v. *Ludwig*, 292 Mass. 251, 255. Sometimes such a happening is called a "superseding cause." Am. Law Inst. Restatement: Torts, § 440. See also § 442, which states some of the considerations that are of importance in determining whether an intervening force is a superseding cause of harm. In § 448 the following rule is stated: "The act of a third person in committing an intentional tort or crime is a superseding cause of harm to another resulting therefrom, although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime, unless the actor at the time of his negligent conduct should have realized the likelihood that such a situation might be

created thereby and that a third person might avail himself of the opportunity to commit such a tort or crime." Where the harm is "different in kind from that which would otherwise have resulted from the actor's negligence" and is "extraordinary" rather than "a normal response to the stimulus of a situation created by the actor's negligent conduct," those facts tend to show the operation of a "superseding cause." §§ 442, 443.

In *Carini* v. *Roman Catholic Bishop of Springfield*, 219 Mass. 117, which was decided upon demurrer, the plaintiff declared that the defendant negligently appointed as a clergyman a man of low moral character and gross sexual proclivities, and that this man dragged her from the altar and raped her. This court held that upon "the plaintiff's averments the defendant had no reason to apprehend that . . . [the man] would do more than to seek to seduce the women of his parish into acts of adultery or fornication," and that the plaintiff's declaration failed to show "that the negligence of the defendant in appointing or retaining an unfit man was the direct and proximate cause of the injury which resulted to her." See also *Slater* v. *T. C. Baker Co.* 261 Mass. 424; *Horan* v. *Watertown*, 217 Mass. 185; *Glassey* v. *Worcester Consolidated Street Railway*, 185 Mass. 315; *Texas Gulf Sulphur Co.* v. *Portland Gas Light Co.* 57 Fed. (2d) 801; *Aune* v. *Oregon Trunk Railway*, 151 Ore. 622. In the present case, the only normal or foreseeable result of negligence in failing to repair the door was that some person might enter and steal. What actually happened was harm of a wholly different kind, extraordinary, abnormal, irrational, and impossible to foresee. It cannot be attributed to any fault of the defendant. This result makes immaterial the exceptions of the defendant, and we treat them as waived.

> *Plaintiff's exceptions overruled.*
> *Defendant's exceptions waived.*