JOHN F. LUZ vs. STOP & SHOP, INC. OF PEABODY
(and three companion cases[1]).

Essex.   October 8, 1964. — December 7, 1964.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, KIRK,
SPIEGEL, & REARDON, JJ.

*Negligence,* Store; Assumption of risk; Contributory; Employers' liability:
fellow servant. *Proximate Cause. Agency,* What constitutes, Police
officer, Independent contractor. *Police. Practice, Civil,* Argument by
counsel; Exceptions: whether error harmful; Requests, rulings and in-
structions. *Error,* Whether error harmful. *Evidence,* Opinion, Of
state of mind, Descriptive words.

In an action against the proprietor of a new super market by a police
officer, employed as an independent contractor by the defendant, for
injuries sustained when a customer of the market, while driving a fluid
drive transmission automobile in a roadway adjacent to a "pick up"
area in a wide sidewalk along the front of the market, became confused
by conflicting orders hollered at her by "bundle boys" employed by the
defendant and her automobile hit a heavy ramp for bundle carriages
eight to twelve inches out in the roadway from its proper place against
the sidewalk curbing and "bounced over the ramp and . . . onto the
sidewalk," picked up speed, and struck the plaintiff, stationed there, the
evidence warranted findings that the placement of the ramp, coupled
with the behavior of the "bundle boys," constituted negligence on the
part of the defendant and that such negligence caused the customer to
lose control of her automobile and was a proximate cause of the plain-
tiff's injuries even if the customer was also negligent [203–205]; and
findings of contributory negligence and of assumption of risk on the
part of the plaintiff were not required.   [205]

Police officers of a city, employed on their day off and paid by the pro-
prietor of a super market and stationed on public property adjacent
to the market or in it by their lieutenant "pursuant to" a conversation
with the manager of the market but otherwise "pretty much on their
own," were independent contractors and not employees of the proprietor
nor fellow servants of "bundle boys" employed by the proprietor, so
that one of the officers and the lieutenant were not precluded by the
fellow servant doctrine from recovering from the proprietor for in-
juries sustained through negligence of the "bundle boys."   [205–207]

---

[1] The companion cases are by Millicent H. Greene, Robert B. Hardy, and
Walter J. Kwiecinski against the same defendant.

Luz *v.* Stop & Shop, Inc. of Peabody.

There was no error prejudicial to the defendant in an action for personal injuries with respect to improper references to the "ad damnum" in the closing argument by counsel for the plaintiff where the trial judge instructed the jury, in detail, as to the factors properly bearing upon the determination of damages and his charge was sufficiently strong to counteract the adverse effect of the improper argument. [207–208]

There was no error in an action in the denial of requests for rulings filed in connection with a motion for a new trial but addressed to remarks made by counsel for a party during his closing argument at the trial. [208]

Testimony by the operator of an automobile that she became "confused" while driving it just prior to an accident in which it was involved was admissible at the trial of an action for personal injuries arising therefrom. [208]

Four actions of tort. Writ in the District Court of Southern Essex dated July 31, 1958, and writs in the Superior Court dated March 18, 1959, May 15, 1959, and June 22, 1959, respectively.

Upon removal of the action in the District Court to the Superior Court, the actions were tried together before *Taveira, J.*

*John T. Ronan* (*Philip L. Sisk* with him) for the defendant.

*Joseph J. Hurley & John A. McNiff* (*Samuel Pearl, Anthony Serra, J. Newton Esdaile & Thomas E. Cargill, Jr.,* with them) for the plaintiffs.

Reardon, J. These four actions of tort arose out of the same happening and were tried together with companion actions brought by the same plaintiffs against Ethel J. and Carmen Bianco. The declarations, which are similar in the four cases now before us, allege that on June 26, 1958, the defendant's negligence in the operation and maintenance of premises under its control resulted in injuries to the plaintiffs. In each case, Stop & Shop, Inc. (Stop & Shop) answered with a general denial and an allegation of contributory negligence. In all except the Hardy case the further defence of assumption of the risk was pleaded. The jury returned a verdict in each of the four cases for the plaintiff. We consider the defendant's exceptions (1) to the denial of a motion for a directed verdict in each case, (2) to rulings of the trial judge regarding the admissibility of certain evi-

dence, (3) to the closing argument for the plaintiff Luz, (4) to the denial of a motion for a new trial in each case, and (5) to the denial of requests for rulings which accompanied the motion for a new trial in the Luz case. In summary, the evidence most favorable to the plaintiffs is as follows.

The defendant opened a new super market in the North Shore Shopping Center in Peabody on June 25, 1958. The store was approximately 170 feet square. On the opening day there were 7,100 cash transactions. The sidewalk in front of the store was approximately sixteen feet in width from the front of the store to a six inch curbing. Above this sidewalk was a permanent canopy supported by seven stanchions or columns approximately twenty-three feet apart. Adjacent to the sidewalk was an access roadway between sixteen and twenty feet wide separated from the main roadway and parking area beyond by a raised island. Traffic in the access roadway ran one way in an easterly direction. At the east end of the front of the building were doors for entrance and exit.

In the operation of this self-service super market Stop & Shop provided about 500 carriages or carts each of which weighed twelve to fourteen pounds and had rear wheels larger than those in front. These carriages were used by customers to facilitate the transport of purchases.

The defendant operated a "pickup" service on the sidewalk in front of the store. Stationed there on June 26, 1958, were some twelve to fifteen "bundle boys" employed by the defendant. When a customer came through the exit door he would receive from an employee stationed in that vicinity one half of a numbered "split tag" to be placed by the customer on the windshield of his car. The other half, bearing the same number, would be attached to the carriage containing his purchases. The customer would then drive his automobile from the parking area to the access way. Meanwhile, his carriage would be pushed to the pickup area which commenced at the third stanchion and extended westerly along the sidewalk to the seventh stanchion. As the

customer entered the access way, Stop & Shop employees
would note his number; it would be announced over a micro-
phone, and the bundle boys would "look for a like number
on a carriage and have it ready when the customer pulled
up." If customers chose not to utilize the pickup service,
they could "walk their cart down to the parking lot, put
their groceries in their cars and leave the .carriages."
These carriages were returned to the store by a bundle boy
who nested from ten to twenty or more of them together
and pushed them across the access way to the sidewalk.

By 9 A.M. on June 25, 1958, the bundle boys had placed
against the curb a plywood ramp which enabled them to
push the nested carts from the access road up onto the side-
walk, two of the boys pushing from the rear and two in
front guiding the carts. Later that day a heavier ramp ap-
proximately three feet wide and four feet long and sloping
from the sidewalk to the street was placed in the access
road. This second ramp was located opposite the exit door
some six or eight feet from the second stanchion. Fre-
quently, cars using the access way in departing the pickup
area went over the ramps, causing them to shift away from
the curbstone. The plaintiffs Luz and Kwiecinski observed
this on numerous occasions. On both days the ramps were
moved back against the curb by one or more of the bundle
boys and by the plaintiff Kwiecinski "a couple of times."

A detail of seventeen Peabody police headed by Lieuten-
ant Luz, and including Officer Kwiecinski, both of whom
were on their day off from regular police duty, had been
dispatched to the defendant's store at its request. Mem-
bers of the detail learned of their assignment from a notice
posted on the police station bulletin board. On the morn-
ing of June 25, the detail in uniform proceeded from the
police station to the defendant's store, and Luz sought out
the store manager for "assistance" and "authority." Luz
was told by the manager what was expected of the detail,
and he then assigned his men to various positions for the
ceremonies attendant on the opening of the store. After
the manager had indicated what he "thought should be done

prior to the opening," the police were "pretty much on their own." Luz was in general supervisory charge of the activities of the officers. Compensation for the service rendered by the police was transmitted by the defendant to the police station where it was subsequently distributed to each member of the detail.

At approximately 2 P.M. on June 26, 1958, a car struck the heavier ramp and moved it eight to twelve inches away from the curbing. The ramp remained in this position. At about 2:25 P.M. the plaintiff Kwiecinski was stationed inside the store near the entrance, about two feet from the front wall, while the plaintiff Luz was standing outside and to the "side of the doorway."

Ethel J. Bianco had come on that day to the Stop & Shop for groceries. The day was fair and clear, the road was dry, and visibility was good. Having completed her shopping she left the store with a carriage containing her bundles. She was given a split tag bearing the number eleven. She placed the tag on her car in the parking area and then drove to the pickup area. The car was equipped with a fluid drive type of transmission and power brakes and possessed no clutch. On the floor, about two inches apart and at the same level, were the brake and accelerator pedals. The rubber covering on the brake pedal was worn on the end closer to the accelerator pedal. At the end of the brake pedal was a small steel bar that extended out about three quarters of an inch on both sides. Between January and June, 1958, Mrs. Bianco had experienced no mechanical trouble with her car which had been driven 3,000 to 4,000 miles.

As Mrs. Bianco approached the access way she stopped at the end of a line of cars heading east with two or three cars ahead of her. A boy at the microphone who was wearing a white uniform said, "Number 11, come to station one." In response to this request she moved her car past the car in front of her and stopped alongside the car at station #2, near the third stanchion. At this time station #1 was vacant. A bundle boy had gone to the rear of her

station wagon and opened the tail gate. Two other bundle boys on the sidewalk then told her to pull into the curb and not block traffic. They were "hollering" at her. One boy was shouting, "Go back, go back." Other boys were saying, "Pull in, pull in, don't stand there." She was confused. Touching her foot lightly on the gas, she started forward, then cut her wheels towards the curb at an angle of forty-five degrees and came into the area near the ramps. She "put . . . [her] foot on the brake to come in very slowly, and all of a sudden there was a bump." Mrs. Bianco's foot slipped off the brake onto the accelerator. The car "bounced over the ramp and . . . onto the sidewalk." It picked up speed as it went across the sidewalk and continued into the end of the store, striking all four plaintiffs and inflicting a variety of personal injuries. These included the loss of a leg by the plaintiff Luz through a high amputation. The car came to rest with a part of it inside the store.

1. It is contended by Stop & Shop that the placement of the ramp in the access roadway and its presence there for a prolonged period violated no duty to the plaintiffs. The defendant emphasizes that the ramp was a proper accessory related to business purposes; that it was open and obvious to the plaintiffs; that the plaintiff police officers saw cars strike the ramp, causing it to shift away from the curb on numerous occasions but took no action; and that the plaintiff Kwiecinski moved the ramp back against the curb "a couple of times." The thrust of the defendant's argument is that no risk of harm from the conditions described was reasonably foreseeable by it; hence the trial judge should have granted the motion for a directed verdict in each case.

As to any invitee Stop & Shop owed the duty of ordinary care and diligence to maintain its premises in a reasonably safe condition. *Brooks* v. *Sears, Roebuck & Co.* 302 Mass. 184, 186. What constitutes the required care and diligence is a question of fact. *Campbell* v. *Boston,* 189 Mass. 7, 10. Only where no view of the evidence could warrant a jury in finding the defendant negligent can it be held as a matter

of law that the plaintiffs cannot recover.  See, e.g., *Mudge* v. *Stop & Shop, Inc.* 339 Mass. 763.  The jury could reasonably find that the placement of the ramp, coupled with the behavior of the bundle boys, constituted negligence.

Liability of the defendant is necessarily predicated on its negligence as the proximate cause of the plaintiffs' injuries. Stop & Shop contends that the negligent operation of a motor vehicle by Mrs. Bianco was not a foreseeable circumstance for which it is responsible, and that Mrs. Bianco's action constituted a "superseding intervening cause" for the results of which the defendant is not chargeable.  The defendant's reliance on such cases as *Falk* v. *Finkelman*, 268 Mass. 524, *Andrews* v. *Jordan Marsh Co.* 283 Mass. 158, *Bellows* v. *Worcester Storage Co.* 297 Mass. 188, *Waugh* v. *Great Atl. & Pac. Tea Co.* 317 Mass. 230, and *Burgess* v. *Chicopee Sav. Bank,* 336 Mass. 331, is misplaced.  In each of these cases the injuries sustained arose out of independent acts of third parties.  Similarly distinguishable is *Addison* v. *Green Cafe, Inc.* 323 Mass. 620, where in the midst of a fracas between two soldiers, the prolongation of which was caused by the defendant's negligence, a third party unaccountably began firing a revolver, injuring the plaintiff.  There was no evidence tending to connect the act of the third party with the defendant's negligence.  In the instant case, however, the jury could find that the defendant's negligence, as related herein, caused Mrs. Bianco to lose control of her automobile.  See Restatement: Torts, § 441, comment c (1934).  See also Restatement 2d: Torts (Tent. draft No. 9, 1963) § 443.  The jury could further find that the injuries sustained were within the relation of cause and effect and were legally attributable to the defendant's negligence.  *Lane* v. *Atlantic Works,* 111 Mass. 136, 140.  *Leahy* v. *Standard Oil Co. of N. Y.* 224 Mass. 352, 362–363.  To be held liable the defendant need not have foreseen the precise manner in which the injuries occurred. *Hill* v. *Winsor,* 118 Mass. 251, 259.  *Ryder* v. *Robinson,* 329 Mass. 285, 287.  *Altman* v. *Barron's, Inc.* 343 Mass. 43, 47. Restatement: Torts, § 435 (1948 Supp.).  That Mrs. Bianco

may also have been negligent does not improve the defendant's position. See Restatement 2d: Torts (Tent. draft No. 9, 1963) § 442B. The jury could find "that such negligence was foreseeable and did not supersede that of the defendant as an effective factor in causing harm to the plaintiff[s]." *Bannon* v. *Peerless Weighing & Vending Mach. Corp.* 318 Mass. 607, 609. *McDonald* v. *Snelling,* 14 Allen, 290. *Turner* v. *Page,* 186 Mass. 600. Restatement: Torts, § 447 (1934). Cf. *Bellows* v. *Worcester Storage Co.* 297 Mass. 188.

2. The defendant contends that the conditions which existed in front of the store were more obvious to the policemen plaintiffs than to the defendant; thus there was no duty to warn. This argument refers, however, only to the use of the ramp. It ignores the negligent behavior of the bundle boys. For their negligence within the scope of employment the defendant is liable. *Fanciullo* v. *B. G. & S. Theatre Corp.* 297 Mass. 44, 46, and cases cited. *Curran* v. *Dorchester Theatre Co.* 308 Mass. 469, 472.

3. The defences of assumption of risk and contributory negligence, which were raised by the defendant, are ordinarily questions for the jury, the burden of proof in each instance being upon the defendant. *Cambra* v. *Santos,* 233 Mass. 131. *Gray* v. *Boston, Revere Beach & Lynn R.R.* 261 Mass. 479. *Parsons* v. *Dwightstate Co.* 301 Mass. 324. *Sullivan* v. *Hamacher,* 339 Mass. 190.

"There is no absolute safety in life, and the most ordinary acts involve possible danger. Mere knowledge that some danger exists is not conclusive of the negligence of one who fails to avoid it. . . . One is not negligent unless he takes greater risks than a man of ordinary prudence would take in a like situation." *Barnes* v. *Berkshire St. Ry.* 281 Mass. 47, 50. Accord: *Powers* v. *Boston,* 154 Mass. 60, 63. Given the concurrence of negligent acts attributable to the defendant, we cannot say that a finding of either contributory negligence or assumption of risk was required. See *Mello* v. *Peabody,* 305 Mass. 373.

4. The defendant argues that the plaintiff policemen

were its employees and are barred from recovery by reason of the fellow servant rule. It is further argued that no recovery is available under the Employers' Liability Act because of failure to give notice under G. L. c. 153, § 6. Without commenting on the merits of these contentions as applied to employees, we hold that policemen Luz and Kwiecinski were independent contractors. They were not fellow servants of the bundle boys in respect to the risk created by the negligence of the latter employees. *Engel* v. *Boston Ice Co.* 295 Mass. 428, 433.

While most of the police officers performed their duties on the property of Stop & Shop, at least one officer was "stationed at the Andover Street entrance." See *Kidder* v. *Whitney,* 336 Mass. 307 (special police officer positioned at entrance to drive-in theatre). For purposes of characterization of the status of the policemen, we see no reason to differentiate between those stationed on public property adjacent to the defendant's premises and the policemen plaintiffs who spent most of their time on the premises. Our conclusion that, as to Stop & Shop, the policemen were independent contractors rather than employees rests primarily on the evidence relating to the right to control the manner in which the police officers performed their duties. See *Shea* v. *Bryant Chucking & Grinder Co.* 336 Mass. 312, 314. In this respect the case differs sharply from cases such as *Cowan* v. *Eastern Racing Assn. Inc.* 330 Mass. 135, which deals with the misconduct of police officers acting under orders given by the defendant.

Lieutenant Luz conversed with Waldron, the store manager, and dispersed the men "pursuant to this conversation." Luz stated in answer to an interrogatory that "I received my instructions from Mr. Ed Waldron . . . where to place my men, and I did as instructed. My job was to see that the men were at their stations and to discharge their responsibilities to the satisfaction of Stop & Shop, Inc." This does not reveal an employment relationship, for, it could be found, the conversation was but a narration of material facts to Luz, who retained the power to decide

how best to govern the activities of the police detail. See *Kidder* v. *Whitney,* 336 Mass. 307, 309. Seavey, Agency, § 84G (1964). Waldron testified that after his conversation with Luz "the police were pretty much on their own." The fact that the police officers were on their day off and were paid by the defendant is not controlling. *Yates* v. *Salem,* 342 Mass. 460.

5. We perceive no prejudicial error, in view of the defendant's offer of proof, in the ruling of the trial judge that Mrs. Bianco need not answer any question as to which she claimed a constitutional privilege.

6. The defendant contends that the closing argument of counsel for Luz was highly prejudicial (an issue properly before this court, see *London* v. *Bay State St. Ry.* 231 Mass. 480, at 486). Counsel made reference to the ad damnum and asked the jury to award $200,000. He repeatedly used the term "ad damnum" and asked the jury to place the ad damnum on "the crushed body of John Luz." "This was improper argument and it was incumbent upon the judge to counteract its effect. Whether he stop counsel at the moment of the offence, or deal with the subject later in his charge is a matter largely within his discretion." *Gardner* v. *State Taxi, Inc.* 336 Mass. 28, 31. See also *Commonwealth* v. *Cabot,* 241 Mass. 131, 150–151 (duty of trial judge "to instruct the jury to cast aside in their deliberations the improper considerations that had been presented to them, using such clear and cogent language as would correct the obviously harmful effect of the argument"). In his instructions to the jury the trial judge emphasized that "what counsel say is not evidence" and that the case must be decided on the evidence. He stated that "all this discussion about the ad damnum actually has no relative value, because you are to assess damages . . . without any consideration as to the amount of the writ." The jury were further instructed, in detail, as to the factors properly bearing upon the determination of damages. We are satisfied that this charge was sufficiently strong to counteract the adverse effect of the improper argument. It is to be

expected that jurors will comply with instructions of this nature. *Commonwealth* v. *Crehan,* 345 Mass. 609, 613.

The defendant filed certain requests for rulings in connection with its motion for a new trial in the case of John F. Luz. These requests were addressed to the remarks made by counsel for the plaintiff Luz during his closing argument. There was no error in the denial of these requests, which relate to matters of law which were raised at the trial. See *Vengrow* v. *Grimes,* 274 Mass. 278, 280. Nor was there error in the denial of the motion for a new trial in each case.

7. Finally, we reject the defendant's contention that the trial judge committed prejudicial error by allowing Mrs. Bianco to state that she was "confused" while operating her motor vehicle just prior to the accident. The challenged testimony was not opinion evidence. Cf. *Renwick* v. *Eastern Mass. St. Ry.* 275 Mass. 145; *Birch* v. *Strout,* 303 Mass. 28. Rather it was evidence of a state of mind and therefore admissible. See *Carriere* v. *Merrick Lumber Co.* 203 Mass. 322, 327; *Goldman, petitioner,* 331 Mass. 647, 651; Wigmore, Evidence (3d ed.) § 1974. We might add that in response to an interrogatory propounded by the defendant, the plaintiff Luz stated that Mrs. Bianco "appeared confused" at the time in question. This evidence, to which no objection was taken, tended also to prove by the use of a word of summary description the state of mind of Mrs. Bianco and was admissible. See *Mielke* v. *Dobrydnio,* 244 Mass. 89, 91–92; *Kane* v. *Fields Corner Grille, Inc.* 341 Mass. 640, 647, and *Commonwealth* v. *Harrison,* 342 Mass. 279, 285.

*Exceptions overruled.*