COMMONWEALTH *vs.* ROY M. WALTER
(and five companion cases).

Norfolk.  March 19, 1980. — July 11, 1980.

Present: BROWN, PERRETTA, & KASS, JJ.

*Practice, Criminal,* Directed verdict, Questioning of witness by judge.
*Burning of Property.  Evidence,* Past recollection recorded, Emotional
state, Cross-examination, Chalk drawing.  *Witness,* Impeachment.

At the trial of two defendants charged with burning a building with in-
tent to defraud an insurer, burning a building, and destruction of
property by explosion, evidence that a store owned by the defendants
was blown up by a high explosive, that the defendants were the last
persons in the store, that one of the defendants was in the store later
than he had told the police and had evinced peculiar concern as to
when a neighboring store was closing, and that the defendants had at-
tempted to profit from the loss on their insurance policy was sufficient
to warrant denial of their motions for directed verdicts.  [257-261]
At the trial of two brothers on charges arising from an explosion and fire
at a store owned by them, there was no error in permitting an insur-
ance broker to testify as to a conversation with one of the brothers on
the day after the explosion, even though he could not remember which
brother it was, or in admitting in evidence a contemporaneous memo-
randum made by the witness which identified the brother with whom
he had spoken, where the brother identified in the broker's notes ad-
mitted in his testimony that he had spoken to the broker on the day in
question [261]; nor was there error in the judge's questioning of the
broker which was correctly neutral and designed to draw coherence
from a confused witness [262]; nor was there error in the judge's in-
terim instruction to the jury following the broker's testimony [262].
At the trial of a defendant on charges arising from an explosion and fire at
a store owned by him, the judge did not abuse his discretion in ex-
cluding a question to the defendant as to his emotional state when he
arrived at the store after the fire.  [262-263]
At the trial of two defendants on charges arising from an explosion and
fire at a store owned by them, the defendants were not prejudiced by a
remark made by the prosecutor during cross-examination of one of the
defendants.  [263]

At the trial of two defendants on charges arising from an explosion and
fire at a store owned by them, the judge did not err in permitting to go
to the jury room a chalk consisting of figures put on a blackboard dur-
ing the testimony of an insurance loss auditor. [263-264]

INDICTMENTS found and returned in the Superior Court
on December 20, 1976.

The cases were tried before *Dwyer*, J.

*Marshall D. Stein & Melvin S. Louison* for the defend-
ants.

*Matthew T. Connolly*, Assistant District Attorney, for the
Commonwealth.

KASS, J. Around 10:25 P.M. on April 23, 1976, an explo-
sion and subsequent fire destroyed the Malmark television,
stereo and appliance store in Westwood and severely
damaged adjoining stores in the Westwood 128 Plaza. The
defendants are Roy and Mark Walter, brothers who owned
and operated Malmark;[1] each was convicted by a jury of
burning a building with intent to defraud an insurer,[2] burn-
ing a building,[3] and destruction of property by explosion.[4]

After the Commonwealth rested, and again at the close of
all the evidence, the defendants moved for a directed ver-
dict. In each instance the motion was denied. The defend-
ants stake their claim of error principally on denial of these
motions. Indeed, from a supplemental brief filed on behalf
of the defendants we infer that this is the ground on which
the defendants have staked their all, but in the absence of an
express waiver of the other points raised in the initial brief,
we shall consider those as well.

The judgments must be affirmed.

___

[1] The full business name was Mal Mark Service, Inc. in the record
Mark Walter and Roy Walter are described simply as the "owners" of
Malmark. We assume this means they were the controlling shareholders
of the corporation, as well as its officers.

[2] G. L. c. 266, § 10.

[3] G. L. c. 266, § 2.

[4] G. L. c. 266, § 101.

1. *The motions for a directed verdict.* The evidence we are to consider is that which was introduced up to the time the Commonwealth rested. *Commonwealth* v. *Kelley,* 370 Mass. 147, 150 (1976). *Commonwealth* v. *Borans,* 379 Mass. 117, 134 (1979). *Commonwealth* v. *Rhoades,* 379 Mass. 810, 815 (1980). This evidence we test by the standard whether, considered in the light most favorable to the Commonwealth, there is "enough evidence that could have satisfied a rational trier of fact of each [essential] element [of the offense] beyond a reasonable doubt." *Commonwealth* v. *Latimore,* 378 Mass. 671, 677-678 (1979). *Commonwealth* v. *Sandler,* 368 Mass. 729, 740 (1975). *Commonwealth* v. *Dunphy,* 377 Mass. 453, 455-456 (1979). *Commonwealth* v. *Rhoades, supra* at 815. This evidence must be more than "some record evidence, however slight." *Commonwealth* v. *Latimore,* 378 Mass. at 677. Inferences "that are not too remote according to the usual course of events" may be considered. *Id.* at 676. The inferences need not be inescapable or necessary, so long as they are reasonable, possible and not unwarranted because too remote. *Commonwealth* v. *Chinn,* 6 Mass. App. Ct. 714, 716 (1978). Convictions may rest entirely or mainly on circumstantial evidence, *Commonwealth* v. *Asherowski,* 196 Mass. 342, 346 (1907), but "no essential element of the crime may rest in surmise, conjecture, or guesswork." *Commonwealth* v. *Kelley,* 359 Mass. 77, 88 (1971). *Commonwealth* v. *Duffy,* 4 Mass. App. Ct. 655, 659 (1976). As Thoreau remarked, "Some circumstantial evidence is very strong, as when you find a trout in the milk." [5]

Applying these standards, we summarize the facts which the evidence warranted the jury in finding at the close of the Commonwealth's case.

On the evening of April 23, 1976, prior to the explosion, Roy Walter went in and out of Patricia's Sub Shop, one of the stores in the four-store building in which Malmark was located, and asked Patricia Ketchum, who was employed at

---

[5] The Oxford Dictionary of Quotations 547 (2d ed.).

the sub shop, several times when she was going to close and if "it was slow enough in the store to close early." Roy, although generally of a nervous mien, struck Ketchum as particularly nervous that night. She last saw him at about 8:00 P.M. or shortly thereafter, and closed her store at 9:00 P.M.

In the opinion of Thomas O'Reilly, an agent with the Bureau of Alcohol, Tobacco and Firearms who concentrated in post-blast investigations and post-blast investigative techniques, the damage at the Malmark store was caused by a high explosive placed on the floor. O'Reilly cited as reasons for his opinion: lines of striation running from a hole in the concrete; the crater in the floor itself; the extent to which the cinder block was pulverized; the distance window glass was blown and the way it shattered; the manner of destruction of the rear wall; and damage to the base of a heavy duty mixer located in an adjoining bakery, Zeppy's. The hole covered an area of approximately fifteen inches by ten inches, and was two to two and one-half inches deep. O'Reilly's conclusion was that the damage at Malmark was not of a kind he would connect with a gas explosion — the defense having attributed the explosion to a faulty gas heater located on the roof. An explosives technician from the office of the State Fire Marshal, Leo Voght, testified that he had investigated the explosion and that the damage he observed had been caused by detonation of an explosive located at the wall between Malmark and Zeppy's bakery. He, too, spoke of the hole in the floor, the damage to the machinery in Zeppy's and the nature of the destruction of the cinder block. Neither specialist was able to find any residue of an explosive or equipment to set it off.

Westwood's building commissioner, William Hulbig, had inspected the Malmark store during its construction, after the concrete floor had been poured and before covering was put over it, and there was no hole in the floor at that time.

Roy Walter told Officer Hill of the Westwood police that he secured Malmark approximately 9:00 P.M. to 9:15 P.M., including setting the alarm for the night and locking the doors, and then went to Hungry Hamburgers, of which he

was also the owner, closed it up and left for home shortly after 9:45 P.M. Two witnesses who worked in stores near Malmark, however, saw Roy in the Malmark store, which was then darkened, one at about 9:30 P.M. and the other at 10:15 P.M. There was also evidence that Mark had been in the store at a time shortly before the explosion.[6]

Malmark had an elaborate security system. Both Mark and Roy said that they had turned on the alarm and locked the doors. Investigation of the store after the explosion disclosed that the burglar alarm system was in the off position and that the slide-bolt lock on the rear door was in the open position. It was inferable that one leaving the store by that door could not close the slide-bolt behind him. A routine police check minutes before the explosion showed no sign of a forced entry into the Malmark store.

The insurance claim for inventory loss which the defendants made after their store was destroyed exceeded the inventory in the store as reconstructed by one Dubin, an insurance loss auditor.

At the end of the Commonwealth's case, therefore, the jury were warranted in concluding that: the defendants' store was blown up by a high explosive; the defendants were the last persons in the store; Roy was in the store later than he had told the police; Roy had evinced peculiar concern as to when neighbors were closing; and the defendants attempted to profit from the loss on their insurance policy. To be sure, much evidence was offered by the defendants (including that of an expert who opined that the explosion was characteristic of one ignited by gas) which cast doubt on the evidence offered by the Commonwealth. However, the resolution of those doubts, the weighing of inferences, the valuation of conflicting expert testimony, and the drawing of a conclusion are precisely the jury's function; i.e., the defendants' evidence may be material to consideration of a

---

[6] This evidence came in through one Rogers, the admissibility of whose testimony the defendants challenge. We resolve this point against them later in this opinion.

motion for a new trial, but it is not material to determining the sufficiency of the Commonwealth's evidence at the close of its case. Compare *Commonwealth* v. *Kelley*, 370 Mass. at 150 n. 1, which contemplates the possibility of deterioration of the Commonwealth's position between the time when it rests and the close of all the evidence and, on renewal of defense motions, a reappraisal of a defendant's rights in consideration of all the evidence. We perceive no such deterioration in the Commonwealth's position as to proof. See *Commonwealth* v. *Holiday*, 349 Mass. 126, 129 (1965); *Commonwealth* v. *Scanlon*, 373 Mass. 11, 20 (1977). As in *Commonwealth* v. *Rhoades*, 380 Mass. at 817, the evidence does not "tend equally to support either of two inconsistent propositions" and permitted the jury to infer that the defendants intentionally blew up their store.

Those facts we have enumerated as ones which the jury might have found touch on factors described in *Richardson* v. *Travelers Fire Ins. Co.*, 288 Mass. 391, 396 (1934), as generally considered significant in arson cases for the purpose of collecting insurance proceeds. The owners alone possessed means of entering the store without force and leaving it in the condition in which it was found by the firemen. *Commonwealth* v. *Asherowski*, 196 Mass. at 347. *Commonwealth* v. *Selesnick*, 272 Mass. 354, 359 (1930). There was an insurance claim which was inflated. See *Commonwealth* v. *Cooper*, 264 Mass. 368, 374 (1928). There was financial benefit to the owners. *Commonwealth* v. *Bader*, 285 Mass. 574, 577 (1934). There was also evidence of misleading statements made by the defendants during investigation. *Commonwealth* v. *Vellucci*, 284 Mass. 443, 445-446 (1933). *Commonwealth* v. *Murphy*, 1 Mass. App. Ct. 71, 75 (1973). The defendants' presence near the building shortly before the fire may be taken into account. See *Osvaldo Varane, Inc.* v. *Liberty Mut. Ins. Co.*, 362 Mass. 864 (1972).

The defendants urge, however, that the prosecution's expert testimony rested on a faulty premise: that the hole in the floor was not there before the explosion. To assume the

absence of the hole, they argue, was speculation and, therefore the expert opinions collapse in the face of cases such as *Brown* v. *United States Fid. & Guar. Co.,* 336 Mass. 609, 613-614 (1958), and *Swartz* v. *General Motors Corp.,* 375 Mass. 628, 633 (1978), holding that an expert may not base an opinion on speculation or facts not in evidence. Apart from the fact that the Commonwealth did produce evidence that the hole was not there before the explosion and that the hole appeared to be the location of the source of lines of striation left in the walls of the building by the explosion, it is not fanciful for an investigator in these circumstances to take it as a given that a floor in the ordinary course does not have a big jagged hole in it. The defendants introduced evidence through a carpenter who worked on finishing the store that such a hole did exist before the store burned, but this conflict, again, was for the jury to sort out and is not material to the directed verdict issue.

2. *The testimony of Rogers.* An insurance broker, one Rogers, testified that in response to a telephone call he went to the Malmark store the day after the explosion and spoke with Mark, who told him that he had locked up at 10:10 P.M. the previous night. Direct examination and cross-examination revealed that Rogers did not know Mark from Roy and did not remember which of the two he saw. After much examination, in which the judge participated, a contemporaneous memorandum made by Rogers of his meeting, identifying the person with whom he spoke as Mark, was admitted in evidence under the past-recollection-recorded rule. The defendants complain that two errors tainted the Rogers testimony. Since Rogers could not tell one Walter brother from the other, the defendants say, the entire testimony should have been struck because whoever introduced himself to Rogers as Mark might have been someone else; i.e., Rogers had no proper basis for identifying the person he spoke to as Mark. Cf. *Commonwealth* v. *Harris,* 232 Mass. 588, 591 (1919). Here, however, Mark in subsequent testimony of his own confirmed that he spoke to Rogers on April 24 and any doubt about whom Rogers was talking to was resolved.

The second claim of error regarding the Rogers testimony is that the judge became excessively partisan when he participated in the questioning of Rogers. We have read the judge's questioning and find it correctly neutral. Its design was to draw coherence from a confused witness. Indeed, the judge appears at one stage to have invited a defense motion to strike Rogers' testimony. See *Commonwealth* v. *Hanscomb*, 367 Mass. 726, 730 (1975); *Commonwealth* v. *Festa*, 369 Mass. 419, 422-423 (1976); *Commonwealth* v. *Fitzgerald*, 380 Mass. 840, 846-847 (1980); *Commonwealth* v. *Charles*, 4 Mass. App. Ct. 853 (1976). The judge's admission of Rogers' memorandum as past recollection recorded was within his discretion. *Fisher* v. *Swartz*, 333 Mass. 265, 268-271 (1955). *Commonwealth* v. *Greene*, 9 Mass. App. Ct. 688, 690-691 (1980). Leach & Liacos, Massachusetts Evidence 83-84 (4th ed. 1967).

3. *The interim instruction.* After Rogers' testimony, the judge instructed the jury that it was for them to decide which (if either) brother had spoken to Rogers and that whichever brother they determined it was, the evidence, if the jury believed it beyond a reasonable doubt, could only be considered in the case against that brother. The interim charge was unexceptionable and nonprejudicial, especially in the light of Mark's later testimony about having talked to Rogers. The defendants have offered no authority to the contrary.

4. *Excluded testimony of Mark.* Counsel for Mark put to his client the question: "And can you describe your emotional state when you got to Westwood?" The question was excluded. At the side bar counsel made an offer of proof that "He's going to say that when he saw the store he became very emotional and started to cry." While a witness may "describe the emotional, mental, or physical condition of another in terms of summary description," [7] *id.* at 90-91,

---

[7] For example, driver of car was "confused," *Luz* v. *Stop & Shop, Inc. of Peabody*, 348 Mass. 198, 208 (1964); defendant described as "angry" and "upset," *Commonwealth* v. *Harrison*, 342 Mass. 279, 285 (1961).

a self-description such as "very emotional" unaccompanied by evidence which describes for the jury what this means is of little assistance in indicating how the defendant really felt and the judge, in his discretion, could exclude it. See *Foley* v. *Boston & Me. R.R.,* 193 Mass. 332, 335 (1907). The second part of the anticipated answer, that he "started to cry," was nonresponsive to the question.

5. *Miscellaneous claims of error.* (*a*) During the prosecutor's cross-examination of Mark, the following exchange occurred:

> Q:  "Well, couldn't Roy have gone with you back to Stoughton and taken his own car and come back here, then you could have gone home earlier, isn't that true?"
>
> A:  "That's not the way I did it.  I told him I would pick him up."
>
> Q:  "I know that is not the way you said you did it."
>
> COUNSEL FOR MARK:  "Objection."

The defendants characterize the prosecutor's last remark as an impermissibly prejudicial statement to the jury.  Apart from there being some plausibility to the prosecution's explanation that the phrase was preliminary to a question which was cut off by defense counsel's objection, the statement is qualitatively distinct from a prosecutor's expression in closing argument of personal belief in the defendant's guilt, proscribed conduct to which the defendant attempts to compare it.  See *Commonwealth* v. *Earltop*, 372 Mass. 199, 203-204 (1977).  There is no suggestion of an unfair juxtaposition of questions.  Compare *Commonwealth* v. *Roberts*, 378 Mass. 116, 126-127 (1979).  What the prosecutor was doing in his cross-examination was striking a hard blow, but not a foul one. *Berger* v. *United States*, 295 U.S. 78, 88 (1935).  (b) Finally, the defense claims the judge erred in permitting to go to the jury room a chalk consisting

of figures put on a blackboard during the direct testimony of Dubin, the insurance loss auditor. A judge has "considerable, but not unrestrained, discretion as to the degree to which chalks can be used." Leach & Liacos, op. cit. 290-291. See also *Everson* v. *Casualty Co. of America,* 208 Mass. 214, 219-220 (1911). A chart collating evidence of checks and deposit slips used in conjunction with an accountant's testimony has been admitted. See *Commonwealth* v. *Greenberg,* 339 Mass. 557, 581-582 (1959). The blackboard in question consisted merely of a transcription (literally in chalk) of figures which had been testified to and which the jury could scarcely have been expected to retain in their heads. It was a useful nonprejudicial aid.

*Judgments affirmed.*