SULLIVAN, J.
*333 On November 28, 2010, Kimmy Dubuque (Kimmy)[2] was hit by a speeding sport utility vehicle (SUV) while walking into a Cumberland Farms, Inc. (Cumberland Farms), convenience store in Chicopee (Chicopee store). She died instantly. The SUV had traveled at high speed across an intersection, through the "apex" entrance into the Chicopee store's parking lot, and crashed through the facade of the store.
Kimmy's husband, Albert, as executor of her estate (Albert or the plaintiff), brought this action pursuant to G. L. c. 229, § 2, alleging that her death had been caused by the negligence and gross negligence of Cumberland Farms. Specifically, Albert claimed that Cumberland Farms, which *321 had experienced hundreds of "car strikes" at its convenience stores, was on notice of the risks motor vehicles posed to customers at its stores, including the Chicopee store. Albert claimed that Cumberland Farms could *334 have prevented Kimmy's death by installing bollards or other protective barriers along the walkway and by closing off and erecting barriers at the apex entrance to the parking lot. In its defense, Cumberland Farms argued that it could not be held liable because there had been no prior car strikes at the Chicopee store itself, the accident was completely random and unforeseeable, and there were no reasonable measures that would have prevented the incursion of such a large vehicle traveling at high speed.
After a nine-day trial, a jury found Cumberland Farms negligent and awarded $32,369,024.30 in compensatory damages to the plaintiff, as executor of Kimmy's estate. The jury also found that Cumberland Farms had acted with gross negligence, or had engaged in wilful, wanton, or reckless conduct, and awarded the plaintiff an additional ten dollars in punitive damages.
The plaintiff waived the award of punitive damages because it fell below the $5,000 statutory minimum. See G. L. c. 229, § 2. Cumberland Farms then filed motions for judgment notwithstanding the verdict, new trial, and remittitur. The trial judge denied the first motion. He then concluded that the award of $32,369,024.30 in compensatory damages was disproportionately high compared to the evidence, and the product of "some degree" of passion, partiality, or prejudice. He therefore ordered a new trial on the issue of damages unless the plaintiff accepted a reduced award of $20 million in compensatory damages. The plaintiff accepted the reduced award, and an amended judgment dated January 9, 2017, entered. The parties then filed the present cross appeals.
Cumberland Farms now seeks a new trial on grounds that the judge improperly admitted an internal report regarding 485 prior car strikes at its other stores without first subjecting each of the prior accidents to a "rigorous" review to ensure that they were substantially similar to the Dubuque accident. In the alternative, Cumberland Farms submits that given what it contends was the entirely random and unforeseeable series of events at issue, it did not owe Kimmy a duty of care as a matter of law. Cumberland Farms further maintains that a new trial is required in light of the judge's finding that the jury acted, to some degree, out of passion, partiality, or prejudice. The plaintiff, in turn, seeks reinstatement of the award of $32,369,024.30 in compensatory damages, claiming that the trial judge committed an abuse of discretion when he allowed the motion for remittitur. For the reasons set forth below, we affirm the amended judgment.
*335 Background. For the purpose of reviewing the evidence on the motion for judgment notwithstanding the verdict, we review the evidence presented at trial "in the light most favorable to the nonmoving party," O'Brien v. Pearson, 449 Mass. 377, 383, 868 N.E.2d 118 (2007), reserving other facts and issues for later discussion. The jury could have found the following facts.
1. The accident. On the morning of November 28, 2010, Kimmy and Albert Dubuque went Christmas shopping and stopped at the Chicopee store, which was located on a corner at the four-way intersection of Grove Street, Grove Avenue, and Front Street (intersection), so that Kimmy could buy a cup of coffee. Albert dropped Kimmy off near the front of the store and drove away to park and await her return. Kimmy stepped onto the walkway and opened the front door of the store, whereupon she encountered Amy Gladu, a store employee. Gladu was in the *322 process of taking out a bag of trash. Kimmy held the door open for Gladu while she did this, and the two then started to enter the store.
At roughly the same time, eighty-one year old Edwin Skowyra was driving his 2004 Ford Explorer SUV down Front Street toward the Chicopee store. A short distance before the intersection, he brought the vehicle to a complete stop, likely at a crosswalk.[3] The SUV then began to move forward. As it did so, Skowyra lost control, and the SUV accelerated rapidly.[4] The SUV raced straight down Front Street, across the intersection, and up a short ramp at the apex entrance to the Chicopee store parking lot. By that time, the SUV was traveling at approximately seventy miles per hour and bouncing; its wheels came off the ground. The SUV passed just to the right of a tall Cumberland Farms sign and a set of fueling pumps, up onto the walkway, and crashed through the front door and facade of the store at the same time that Kimmy was going inside behind Gladu. The SUV, which was traveling approximately fifty-seven miles per hour upon impact with the facade of the store, did not stop until it was completely *336 inside the store. The vehicle struck Kimmy and pushed her deep into the store, killing her. Gladu was also injured in the crash but survived.[5]
2. The Dubuques. On November 28, 2010, Kimmy was forty-three years old. She had a loving and close relationship with her husband of sixteen years, Albert, and their one child, Jillian, who was then fourteen years old. The three lived together in Chicopee. They enjoyed a special bond that dated to their shared experience as Jillian underwent treatment for leukemia at the age of two. Kimmy "was always there" through Jillian's hospitalization and medical treatments, and Albert relied on Kimmy heavily during this time. Even after Jillian's leukemia went into remission and she grew older, and started high school, the three continued to be close. They did many things together, including taking nightly walks, golfing, and going to the trailer they maintained at a campground most weekends. As she had throughout most of her adult life, Kimmy also continued to work full time as the director of finance at the Springfield Civic Center. As of November 28, 2010, her annual salary was approximately $79,000. Based on her work life expectancy, her then-present economic value to her family was $1.6 million.
3. Cumberland Farms. Cumberland Farms is a third generation, family-owned company that started as a dairy farm in Cumberland, Rhode Island, and grew into a multi-State chain of convenience stores. Along the way, Cumberland Farms also *323 expanded into the sale of gasoline. By November 28, 2010, it employed approximately 6,500 people and owned and operated nearly 600 convenience stores, many of which included gasoline stations. Cumberland Farms had more than 40 million customer visits per year and generated roughly $17 billion in annual sales revenue.
a. Chicopee store. Since 1974, one of those convenience stores and gasoline stations was located at the intersection in Chicopee. Like many of Cumberland Farms's stores, the Chicopee store sat *337 on a small, crowded lot of land.[6] The store itself, which had a facade consisting of large glass windows, a short brick "knee wall," and a single glass door, sat in the rear corner of the lot. As at most of Cumberland Farms's stores, there were "nose-in" parking spaces along the front and side of the store, designed to provide quick, in-and-out access. The parking spaces were separated from the store by a four-foot wide concrete walkway, elevated a few inches above the surface of the parking lot. There were no devices or barriers along the walkway to protect pedestrians from motor vehicles. Finally, a set of fueling pumps and a tall sign were situated in front of the store, close to the intersection.
Grove Street was the primary road that bisected the intersection in front of the Chicopee store. Grove Avenue and Front Street, meanwhile, approached from opposite sides and terminated at the intersection. All three roads had a single travel lane in each direction, divided by solid double yellow lines, and speed limits of twenty-five miles per hour. The intersection, which was controlled by traffic lights, was "skewed" or "cockeyed," meaning that the roads did not converge at perfect ninety-degree angles. This was significant for two reasons. First, the corner lot occupied by the Chicopee store came to a point, or "apex," at the intersection as a result of the less-than-ninety-degree angle at which the two abutting roads, Grove Street and Grove Avenue, came together. Second, any vehicle traveling on Front Street towards the intersection would, because of the angle at which that road approached, be headed directly at the Chicopee store.
b. Apex entrance. There were three vehicle entrances at the Chicopee store property. There was one entrance each along Grove Street and Grove Avenue, both distanced from the intersection. Consistent with recommended traffic engineering practices, both of those entrances forced motorists to slow to make a "rational transition[ ]" as they executed a ninety-degree turn to enter the parking lot.[7] The same was not true of the third entrance, located at the apex, directly on the intersection, across from Front Street. Motorists could drive in through the apex entrance without turning or reducing speed. Over the years, people operating vehicles of all types had been observed doing just that, often *338 entering the parking lot at high rates of speed. One employee had complained to two separate Chicopee store managers that the situation was dangerous, but no action was taken.
As Cumberland Farms was aware, the use of apex entrances[8] had, for years, been discouraged by the Massachusetts *324 Department of Transportation (DOT) and altogether banned by many municipalities based on the determination that they are dangerous. In the late 1970s, the city of Chicopee (city) enacted its own ordinance prohibiting the use of such entrances. Since the apex entrance at the Chicopee store already existed, however, it was "grandfathered" and was not subject to the ordinance. Nonetheless, in 2009, both the DOT and city approached Cumberland Farms and asked it to close that entrance. Cumberland Farms, aware that the DOT was planning to close the entrance itself as part of a future road project, declined to do so. Nor did it install guardrails or other barriers as an interim measure. As of November 28, 2010, the DOT project was in progress but had yet to reach the intersection, and the apex entrance remained open.
c. Car strikes; bollards. Between 1990 and 2010, there had been hundreds of vehicles striking buildings at Cumberland Farms convenience stores in various locations. In each, a driver, for one reason or another, lost control of a motor vehicle, causing it to strike the building. In some instances these incidents involved customers and employees. Cumberland Farms kept track of these incidents, which were referred to internally as "car strikes."[9] Most of the car strikes involved vehicles traveling at low rates of speed. None had occurred at the Chicopee store.
Over time, employees of Cumberland Farms had become increasingly aware of these car strikes, and took steps to document them. In 1988, Matthew Peterson, who was responsible for tracking car strikes and pursuing claims to recover the cost of the resulting property damage, became concerned by the frequency with which they were occurring-at the rate of approximately one per week. Peterson wrote a memorandum to his superior at Cumberland Farms warning that the car strikes were becoming *339 costly and were eventually going to result in bodily injury.[10] There was no response to his memorandum. The car strikes continued.
In the 1990s, a vehicle pulled into a Cumberland Farms store parking lot, failed to stop, and fatally crushed a man who was using a pay telephone mounted to the side of the building. In 2001, another customer was struck by an uncontrolled motor vehicle as he walked out of the front door of a store in South Deerfield. The driver was driving a pickup truck into a nose-in parking space along the walkway in front of that store when she accidentally stepped on the accelerator, propelling the truck forward. The truck struck the man, pushing him through the brick knee-wall and plate glass window facade.[11] One of the victim's legs was amputated as a result of the accident. In both cases, claims were lodged against Cumberland Farms asserting that it could have prevented the harm by installing protective barriers in front of the pay telephone and along the walkway, respectively. In 2004, Cumberland Farms settled the South Deerfield claim for an undisclosed sum.
Prompted by that settlement, Thomas Masiello, director of risk management for Cumberland Farms, advocated for the implementation of a widespread bollard program to protect customers, employees, and *325 property from uncontrolled motor vehicles. Bollards are posts, consisting of steel tubes, which can be designed and manufactured in varying sizes and strengths, filled with concrete and sometimes reinforcing steel plates, one end of which is sunk several feet deep in the ground into a base of concrete or a combination of concrete and steel reinforcing rebar. In furtherance of his effort, Masiello asked Peterson to provide him with data regarding the history of car strikes at Cumberland Farms stores. Peterson reported that there had been at least 268 car strikes between 1990 and 2004 (2004 internal report). There were no statutes, regulations, or ordinances, however, that required the installation of bollards at stores.[12] While Masiello *340 continued to advocate on an annual basis for a bollard program, his proposal failed to gain support within Cumberland Farms.
The car strikes continued in various locations. For example, in 2009, a car careened through an intersection in Norridgewock, Maine, and ran into the fueling pumps at the Cumberland Farms store there, setting them ablaze and causing bodily injury.[13] The same year, a woman drove a car into the center of a Cumberland Farms store in Hopkinton, causing over $90,000 in property damage. Then, in 2010, a car drove through the front of a Cumberland Farms store in Cromwell, Connecticut, injuring two employees. The spouse of one of the employees sent an electronic mail (e-mail) message to Masiello, requesting that barriers be installed at the store to prevent a reoccurrence.[14] Masiello, in turn, forwarded the message to Cumberland Farms's chief executive officer, Ari Haseotes, who was still considering the long-standing recommendation for a bollard program.
Earlier in 2010, Masiello asked Peterson to update the historical car strike data. According to the resulting report, which consisted of a one-page summary and a lengthy supporting spreadsheet, there had been 485 car strikes between January 1, 2000, and January 28, 2010 (2010 internal report). A number of the car strikes were described in the report in brief terms (e.g., "Damage to building"). However, a large majority were described, in one fashion or another, as having involved vehicles striking the front of a Cumberland Farms store, in many cases at or near the door.[15]
*326 According to the 2010 internal report, the 485 car strikes *341 resulted in at least $1.63 million in property damage and the payment of approximately $2.2 million in personal injury claims. The report was forwarded to and reviewed by Haseotes as he continued to weigh the request for a bollard program.
In the summer of 2010, Haseotes approved a preliminary budget of $2 million for the installation of bollards at 200 Cumberland Farms stores during the next fiscal year. The bollards, which were to be placed along the walkways in front of stores, were designed to protect people and property from low impact, low speed car strikes. To qualify for the program, a store had to have had two or more car strikes, or be among the highest revenue generators. The Chicopee store satisfied neither criterion. As of November 28, 2010, therefore, there was no plan to install bollards along the walkway in front of the Chicopee store.
As of November 28, 2010, Cumberland Farms had yet to install bollards on any significant basis at its stores. To the extent that bollards had been installed at any stores,[16] they were installed primarily to protect Cumberland Farms property, such as structural columns, trash dumpsters, and air and vacuum machines. Only occasionally were bollards installed along walkways in front of stores.[17] To that end, the only bollards at the Chicopee store as of November 28, 2010, had been installed to protect the store's sign.
4. Expert witnesses. At trial, the plaintiff presented the testimony of three expert witnesses, a retired State trooper who specialized in accident reconstruction, a traffic engineer, and a mechanical engineer. In response, Cumberland Farms presented the testimony of its own mechanical engineer. Viewing all of their testimony in the light most favorable to the plaintiff, the jury would have been warranted in finding that, for a reasonable amount of money, protective barriers could have been designed and installed that would have prevented Skowyra's SUV from *342 reaching Kimmy as she entered the Chicopee store.[18] Specifically, the plaintiff's mechanical engineer, who had extensive experience designing bollards and other types of barriers to protect against large vehicles traveling at high speed,[19] opined *327 that a system of bollards, a short radius guardrail, or a group of planters could have been designed and installed at the apex entrance that would have prevented a vehicle the size of Skowyra's, traveling at seventy miles per hour, from encroaching upon the Chicopee store property.[20] He further opined that a system of bollards could have been designed and installed along the walkway that would have stopped such a vehicle traveling at fifty-seven miles per hour, the speed at which the SUV was travelling when it hit the store. The total cost to design and install both sets of barriers would not have exceeded $20,000.[21]
Discussion. 1. The 2010 internal report. Cumberland Farms first argues that a new trial is required because it was unduly prejudiced by the admission of the 2010 internal report and the 485 prior car strikes identified in that report.
Admission of evidence of prior accidents may be "viewed with disfavor because the other incidents 'may have been the consequence of idiosyncratic circumstances.' " Santos v. Chrysler Corp., 430 Mass. 198, 202, 715 N.E.2d 47 (1999) ( Santos ), quoting from *343 Read v. Mt. Tom Ski Area, Inc., 37 Mass. App. Ct. 901, 902, 639 N.E.2d 391 (1994) ( Read ). However, "where substantial identity in the circumstances appears, and the danger of unfairness, confusion or undue expenditure of time in the trial of collateral issues reasonably seems small to the trial judge, he has generally been left free to admit such evidence in his discretion." Robitaille v. Netoco Community Theatres of N. Attleboro, Inc., 305 Mass. 265, 268, 25 N.E.2d 749 (1940) ( Robitaille ). See Denton v. Park Hotel, Inc., 343 Mass. 524, 527, 180 N.E.2d 70 (1962) (trial judge's discretion to admit such evidence is "very considerable"). On appeal, a trial judge's ruling is accorded "great deference" and can be deemed an abuse of discretion only if we conclude that he "made a clear error of judgment in weighing the factors relevant to the decision ... such that the decision falls outside the range of reasonable alternatives." L.L. v. Commonwealth, 470 Mass. 169, 185 n.27, 20 N.E.3d 930 (2014) ( L.L. ) (quotation omitted). We do not reach such a conclusion here.
Before trial, Cumberland Farms filed a motion in limine to exclude all evidence of prior car strikes, including those identified in the 2010 internal report. Cumberland Farms maintained that the incidents were not substantially identical to the Dubuque accident, and that admitting such evidence would result in unfair prejudice, confusion, or undue expenditure of time. After holding a hearing and taking the matter under advisement, the judge denied the motion and ruled:
"I am satisfied that plaintiff has met [his] burden as set forth in Robitaille. The scope of the relevant risk at issue as plaintiff posits, is uncontrolled vehicles hitting at or near a Cumberland Farms store entrance and endangering pedestrians. As in Santos, the 'differences between the other incidents and the plaintiff's accident could be considered by the jury in terms of weight of the evidence.' [ 430 Mass.] at 203 [715 N.E.2d 47]. Counsel may request a curative instruction limiting the scope of admissibility of *328 such evidence at the time such evidence is proffered."
Subsequently, when the plaintiff moved for the admission of the 2010 internal report, the judge confirmed that he had determined that the jury could find that the prior car strikes were "substantially similar" to the Dubuque accident. He also invited Cumberland Farms, for a second time, to request a limiting instruction *344 and shared his own thoughts on what one might look like. Cumberland Farms did not submit a proposed instruction, but did approve of the one outlined by the judge and requested that he provide it to the jury. The judge, therefore, instructed the jury at that time as follows:
"You may consider, if you wish, evidence pertaining to prior car strikes at Cumberland Farms stores as notice to Cumberland Farms of those car strikes and not as evidence of negligence and/or gross negligence on the part of Cumberland Farms in those prior car strikes. You may only consider such evidence as proof of negligence or gross negligence in this case if you first find that the earlier car strikes were substantially similar to the incident at issue.
"And as with all the evidence which [the plaintiff] presents, [the plaintiff] must prove by a preponderance of the evidence that the other car strikes are substantially similar by a preponderance of the evidence."
Later, when evidence of another car strike was admitted, the judge, at Cumberland Farms's request, provided the jury with the instruction for a second time. Cumberland Farms also requested that the instruction, with some additional language, be included in the final charge. The same instruction, therefore, was provided to the jury for a third time, albeit minus the requested additional language.
a. Limiting instruction. Cumberland Farms contends that the limiting instruction was erroneous and improperly served to transfer the judge's gatekeeping obligations to the jury. The judge did not abdicate his gatekeeping function. His role was to determine whether the jury could find substantial similarity between the car strikes identified in the 2010 internal report and the Dubuque accident. See Santos, 430 Mass. at 202, 715 N.E.2d 47. He made that threshold determination. It was for the jurors to make the ultimate finding. The instruction did not suggest anything to the contrary.
b. Substantial similarity. Cumberland Farms further contends that, to the extent that the judge did undertake his gatekeeping obligations, he failed to apply a sufficiently strict test to assess substantial similarity. Specifically, the defendant contends that all prior car strikes from the 2010 internal report should have been excluded unless they were shown to have involved (1) a vehicle crashing into a Cumberland Farms store (2) in a residential and *345 small business area, (3) in a low speed zone, (4) while traveling at or above legal highway speed, (5) and following a medical or other incapacitation of a driver (6) that caused loss of control (7) at a remote location on a public way. The proposed test, however, would result in the exclusion of all car strikes that were not completely identical to the Dubuque accident.
Such an exceedingly rigorous test was not required. While some cases refer to a test of "substantial identity," see, e.g., Robitaille, 305 Mass. at 267-268, 25 N.E.2d 749 ; Read, 37 Mass. App. Ct. at 902, 639 N.E.2d 391, others refer to it as a test of "substantial similarity." See, e.g., Santos, 430 Mass. at 202, 715 N.E.2d 47 ; Commonwealth v. Guinan, 86 Mass. App. Ct. 445, 456, 17 N.E.3d 439 (2014). There is no meaningful difference between the two.
*329 Santos, supra at 202 n.8, 715 N.E.2d 47. The test, which is fact and case specific, is one of relevance. See Kromhout v. Commonwealth, 398 Mass. 687, 693, 500 N.E.2d 789 (1986) ; Read, supra. And, while the circumstances of the other accidents must be substantially similar, they need "not replicate the exact circumstances of the plaintiff's accident." Santos, supra at 203, 715 N.E.2d 47. See Flood v. Southland, 33 Mass. App. Ct. 287, 293, 601 N.E.2d 23 (1992), S.C., 416 Mass. 62, 72-73 n.12, 616 N.E.2d 1068 (1993) ( Flood ). The relevant risk in this case, as the judge properly framed it, "was uncontrolled vehicles hitting at or near a Cumberland Farms store entrance and endangering pedestrians due to a lack of adequate protective barriers." Absolute identity of circumstance was not required, and the reasons for the uncontrolled car strikes need not be the same. It is enough that the evidence showed that Cumberland Farms was aware of the risk of the uncontrolled car strikes at its stores; the evidence was relevant to both foreseeability and breach of duty. "The differences ... could be considered by the jury in terms of the weight of the evidence." Santos, supra.
In particular, Cumberland Farms contends that the trial judge committed prejudicial error by declining to examine the "individual driver behavior" in each of the 485 car strikes to ensure substantial similarity with Skowyra's behavior. For purposes of assessing foreseeability, the assessment of risk is not dependent upon the reason why the driver lost control of his or her vehicle. The 2010 internal report showed that drivers had lost control of their vehicles and struck the fronts of stores for a host of reasons, including brake failure, brake and accelerator pedal confusion, intoxication, inexperience, and inattention. Regardless, what was relevant was whether Cumberland Farms was aware of the risk of uncontrolled vehicles striking the fronts of its stores and endangering *346 customers and employees. The judge did not abuse his discretion when he decided that uncontrolled car strikes, rather than the precise reason for the car strikes, were relevant to the jury's consideration of whether the risk was foreseeable and whether Cumberland Farms was aware of that risk.[22]
c. Detail. Cumberland Farms further contends that it was not possible to determine whether all 485 car strikes were substantially similar to the Dubuque accident because there was insufficient detail in the 2010 internal report. There was, as noted above, sufficient detail to determine that a large majority of the 485 car strikes involved uncontrolled vehicles striking the front of a store, at or near the door. Accordingly, the judge did not abuse his discretion in concluding that the report was sufficiently detailed to go to the jury.
d. Prejudice. Cumberland Farms submits, in the alternative, that, even if the 2010 internal report was relevant, it was unduly prejudicial due to the sheer number of car strikes identified. According to the defendant, 485 incidents exceeds, by an "astounding" amount, the number of prior accidents admitted in any other negligence *330 case.[23] Even if we assume that the number is larger than that admitted in other cases, the concern is not sufficient to warrant the relief sought. The facts spoke for themselves-Cumberland Farms had experienced an average of one car strike per week for a sustained period of time at various stores. Cumberland Farms was on notice of these occurrences and took steps to protect its property, such as the sign at the Chicopee store. The evidence was not presented in a way that overshadowed the trial. The 485 car strikes were presented through a single document, without an undue expenditure of time. Likewise, there was no suggestion that all 485 car strikes involved *347 precisely the same circumstances as the Dubuque accident, and Cumberland Farms was free to point out any differences to the jury. The jurors were equipped to determine what weight, if any, to give the evidence in light of any such differences. In that regard, the judge instructed that the jury were only to consider a prior car strike if they first determined that it was substantially similar.[24] We presume the jury understood and followed that instruction. See Commonwealth v. Donahue, 430 Mass. 710, 718, 723 N.E.2d 25 (2000).
2. Foreseeability. Cumberland Farms next contends that the Dubuque accident was random and unforeseeable as a matter of law, because Skowyra unintentionally encroached upon the Chicopee store property from the adjacent public ways, at "highway-like" speed.
Cumberland Farms was "not a guarantor of the safety of persons lawfully on its premises." Luisi v. Foodmaster Supermkts., Inc., 50 Mass. App. Ct. 575, 577, 739 N.E.2d 702 (2000). Cumberland Farms was obligated to guard against reasonably foreseeable risks of harm, i.e., those risks that it knew or reasonably should have known about and against which it could have employed reasonable preventive measures. See Flood, 416 Mass. at 72-73, 616 N.E.2d 1068 ; Whittaker v. Saraceno, 418 Mass. 196, 200, 635 N.E.2d 1185 (1994) ( Whitaker ).[25] Although Cumberland Farms *331 describes the Dubuque accident as anomalous, the evidence at trial would permit a reasonable juror to conclude that the accident *348 was not random. The plaintiff's expert testified that the long, running approach to the apex entrance posed a threat precisely because it "allows you to have a high velocity impact." Other experts testified that the installation of guardrails or bollards at the apex entrance would have stemmed the impact.[26]
Moreover, the defendant "need not have foreseen the precise manner in which the injuries occurred." Luz v. Stop & Shop, Inc. of Peabody, 348 Mass. 198, 204, 202 N.E.2d 771 (1964). Foreseeability is determined from all of the circumstances. Flood, 416 Mass. at 72, 616 N.E.2d 1068. As such, it "is almost always a question for the jury." Simmons v. Monarch Mach. Tool Co., 413 Mass. 205, 211, 596 N.E.2d 318 (1992).[27] The issue of foreseeability can be resolved as a matter of law only where "no rational view of the evidence would warrant a finding of [foreseeability]." Glick v. Prince Italian Foods of Saugus, Inc., 25 Mass. App. Ct. 901, 902, 514 N.E.2d 100 (1987) ( Glick ). Such is not the case here.
Cumberland Farms relies on Glick to urge us to reach a contrary result. In Glick, two patrons brought claims against the defendant after a driver lost control of his vehicle, causing it to leave the adjacent highway at a high rate of speed, travel sixty feet across the parking lot of the defendant's restaurant, jump over an eight inch high cement bumper stop, crash through the wall of the restaurant, and injure them as they dined inside. Id. at 901, 514 N.E.2d 100. The restaurant did not have outdoor seating or an outside *349 service window, the driver was not intentionally on the property, and there was no evidence of prior car strikes at the restaurant. This court concluded as a matter of law that the defendant could not be held liable because the risk of harm was not reasonably foreseeable. Id. at 902-903, 514 N.E.2d 100. Cumberland Farms suggests that the two cases share certain facts, most notably, the unintentional course of travel of both the uncontrolled vehicles off the adjacent public ways at high rates of speed. The case before us, however, is distinguishable in several material respects.
Cumberland Farms operated a combined convenience store and gasoline *332 station in Chicopee, which, by the very nature of the business, presented a higher level of risk from motor vehicle traffic than the restaurant in Glick. Indeed, Cumberland Farms had experienced numerous car strikes at its stores,[28] including uncontrolled vehicles unintentionally encroaching upon store property at high rates of speed. It also was on notice that the apex entrance posed particular dangers, and, in fact, vehicles had entered the Chicopee store property at dangerously high rates of speed through the apex entrance. Finally, the plaintiff presented sufficient evidence to support a finding that Cumberland Farms could have employed reasonable preventive measures to address those risks. All told, therefore, we cannot conclude, as a matter of law, that no rational view of the evidence would warrant a finding of foreseeability.
3. Duty of care. Separately, Cumberland Farms asks us to declare, as a matter of law, that it did not owe Kimmy a duty of care. Cumberland Farms "was in possession of real estate open to the public for business purposes. It owed a duty to a paying patron to use reasonable care to prevent injury to [her] by third persons whether their acts were accidental, negligent, or intentional." Carey v. New Yorker of Worcester, Inc., 355 Mass. 450, 452, 245 N.E.2d 420 (1969) ( Carey ). "As to any invitee [the store] owed the duty of ordinary care and diligence to maintain its premises in a reasonably safe condition.... What constitutes the required care and diligence is a question of fact." Luz v. Stop & Shop, Inc. of Peabody, 348 Mass. at 203, 202 N.E.2d 771. Given the evidence that was presented to the jury, we cannot say that Cumberland Farms had no *350 duty as a matter of law.[29] The question, more accurately, is whether we can conclude, as a matter of law, that Cumberland Farms did not breach that duty. We do not so conclude.
4. Remittitur. In his cross appeal, the plaintiff challenges the remittitur reducing the verdict from $32 million dollars to $20 million dollars. "A judge acting on a motion for remittitur has broad discretion." Clifton v. Massachusetts Bay Transp. Authy., 445 Mass. 611, 623, 839 N.E.2d 314 (2005) ( Clifton ). In exercising that broad discretion, a judge may remit so much of the damages as he or she "adjudges is excessive, in order to bring the award within the range of verdicts supported by the evidence." Ibid. (quotation omitted).
"The assessment of damages is traditionally a factual undertaking appropriate for determination by a jury as the representative voice of the community." Glavin v. Eckman, 71 Mass. App. Ct. 313, 320, 881 N.E.2d 820 (2008). This is particularly true where the damages available "are difficult to compute and depend upon the judgment of the fact-finding tribunal in appraising the deprivations and 'translating them into a compensatory sum.' "
*333 MacCuish v. Volkswagenwerk A.G., 22 Mass. App. Ct. 380, 398, 494 N.E.2d 390 (1986) ( MacCuish ), quoting from Bartley v. Phillips, 317 Mass. 35, 40, 57 N.E.2d 26 (1944) ( Bartley ). In the end, a jury's "award of damages must stand unless ... to permit it to stand was an abuse of discretion on the part of the court below, amounting to an error of law." Reckis v. Johnson & Johnson, 471 Mass. 272, 299, 28 N.E.3d 445 (2015) ( Reckis ), quoting from Labonte v. Hutchins & Wheeler, 424 Mass. 813, 824, 678 N.E.2d 853 (1997) ( Labonte ).
However, a judge may reduce a verdict where the damages awarded were "greatly disproportionate to the injury proven," represent a "miscarriage of justice," or were so large "that it may be reasonably presumed that the jury, in assessing them, did not exercise a sound discretion, but were influenced by passion, partiality, prejudice or corruption." Reckis, 471 Mass. at 299, 28 N.E.3d 445 (quotations omitted). All that said, however, it is even rarer for a *351 judge's decision on a remittitur to be set aside on appeal as an abuse of discretion. See ibid. (such rulings are "exceedingly rare" and so seldom found as to be "almost nonexistent" [quotation omitted] ). This is not one of those exceedingly rare cases.
a. Passion or prejudice. Upon a finding of negligence, Cumberland Farms was liable under the wrongful death statute for the "fair monetary value" of the loss of Kimmy to her husband and daughter, including compensation "for the loss of [her] reasonably expected net income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel, and advice." G. L. c. 229, § 2, as appearing in St. 1973, c. 699, § 1. The plaintiff maintains that the judge's underlying finding that the jury were infected by passion or prejudice was clearly erroneous, thereby rendering the remittitur an abuse of discretion. The underlying facts are these.
During closing argument, the plaintiff suggested one formula the jury could use to translate the losses into a compensatory sum: taking Kimmy's present economic value to her family ($1.6 million) and multiplying it by five, thereby netting $8 million. The jury, however, were required only to indicate the amount of their award in a lump sum on the verdict slip. It is not possible to determine how much of the award of $32,369,024.30 was attributable to any particular loss. Nor is it evident what formula the jury used.
When the jury declared that they had reached a verdict, the foreperson sent the judge a note, asking if a statement could be read in open court with the verdict. After conferring with counsel, the judge brought the jury into the court room and answered that question in the negative. At his direction, the clerk then proceeded to secure the envelope containing the verdict slip and announce the verdict. The judge then dismissed the parties and met with the jurors to thank them for their service, whereupon he learned that the statement they had sought to share was on a piece of paper in the envelope with the verdict slip. He immediately retrieved the envelope and found the statement. He then brought the parties and jury back into the court room, confirmed what had transpired, and ordered that the statement, which he deemed to have no bearing upon issues of liability or damages, be impounded and shared with no one, including the parties. After subsequent motions were filed, however, the statement was eventually disclosed. It read, "We hope Cumberland Farms will acknowledge *352 this as an opportunity to honor the life of Kimmy Dubuque by investing time and money in the safety of its guests and employees." *334 Following the verdict, Cumberland Farms filed a motion for remittitur pursuant to Mass.R.Civ.P. 59(a), 365 Mass. 827 (1975), arguing that the award of $32,369,024.30 in compensatory damages had no basis in the evidence and, as evidenced by the jury's statement, was driven by bias or passion. After holding a hearing and taking the matter under advisement, the judge issued a detailed written decision and concluded that the jury had acted reasonably in finding the defendant negligent, but that the compensatory damages award was excessive. He found that the award far exceeded what the plaintiff had requested and was disproportionately high compared to the actual evidence of compensatory damages, especially given the absence of any claim that Kimmy had endured conscious pain and suffering. He also found that the jury had, "to some degree," acted out of passion, partiality, or prejudice. The judge therefore reduced the verdict to $20 million and gave the plaintiff thirty days to accept it or proceed to a new trial on compensatory damages. Ultimately, the plaintiff accepted the reduced award.
As noted above, the plaintiff takes issue with the judge's findings that the award of $32,369,024.30 was, to some degree, the product of passion, partiality, or prejudice. The judge was first concerned that the jury had contravened his instructions when they awarded the plaintiff ten dollars in punitive damages. Early in the final charge, the judge had read the text of G. L. c. 229, § 2, to the jury, including the requirement that punitive damages must be "in an amount of not less than [$5,000]." The judge, however, did not return to or highlight that requirement when he elaborated on the issue of punitive damages later in the charge. Nor was there any notation on the special verdict form. In this long and complicated case, with extensive argument and lengthy instructions, the record does not support the finding that the jury ignored the judge's instructions.
The judge was also concerned that the jury had rendered an "inconsistent" verdict. According to the verdict slip, ten jurors had found that Cumberland Farms was negligent, while eleven had found both that its negligence was a substantial contributing factor in Kimmy's death and that it had been grossly negligent. This did not represent an inconsistent or improper verdict. The *353 same jurors were not required to vote "yes" on every question, so long as at least ten did. Jurors were also free when voting on later questions to do so in the context of the outcome of the vote on earlier questions.
The judge was further concerned that, in his view, the jurors ignored his direction that they could not submit a statement to be read in open court, by leaving it in the envelope with the verdict slip. As noted above, however, he issued his ruling in open court and then immediately directed the clerk to retrieve the envelope and announce the verdict. There is nothing in the record to suggest that the foreperson had the opportunity, or should have had the presence of mind, to remove the statement from the envelope. As with the judge's other concerns regarding the verdict slip, this ruling lacked a firm foundation in the record.
Of course, there was also the note itself. The substance of the statement was consistent with the jury's verdict on negligence and gross negligence, and does not suggest that the jury were influenced by partiality, prejudice, or corruption. The judge's stated concerns, viewed individually or collectively, do not support a finding that the jury were influenced by "passion, partiality, prejudice, or corruption."
*335 Reckis, 471 Mass. at 299, 28 N.E.3d 445 (quotation omitted).
b. Excessiveness. Nonetheless, in reviewing a ruling on a motion for remittitur, we do not substitute our judgment for that of the judge who heard the evidence and saw the witnesses. See Baudanza v. Comcast of Mass. I, Inc., 454 Mass. 622, 630, 912 N.E.2d 458 (2009). The judge also based his remittitur on a second ground, the excessiveness of the verdict. The plaintiff maintains that the judge erred as a matter of law when he found that the jury's award was greatly disproportionate to the injury proven. Specifically, the plaintiff contends that the judge erred by failing to consider other appellate decisions in wrongful death cases where awards of compensatory damages were upheld in amounts that suggest the award of $32,369,024.30 was proportional to the evidence. We decline to engage in the "dangerous game" of comparing an award in one case against an award in another. Griffin v. General Motors Corp., 380 Mass. 362, 371, 403 N.E.2d 402 (1980) (quotation omitted). Reckis, 471 Mass. at 303 n.47, 28 N.E.3d 445. MacCuish, 22 Mass. App. Ct. at 399, 494 N.E.2d 390. As the judge noted, his decision was guided by the evidence in this case, not by awards issued in other cases on different *354 facts.[30]
On this basis, the remittitur may be affirmed. The judge found that there was "no evidentiary foundation upon which to conclude that the $32,369,024.30 award represents fair and reasonable compensation to [the plaintiff]. The award is greatly disproportionate to the injury proven...."[31] We cannot conclude that the judge abused his considerable discretion in so finding.
5. New trial. Cumberland Farms submits that, in light of the judge's finding that the jury were influenced to some degree by passion, partiality, or prejudice, it is entitled to a new trial on all issues. As we have already concluded, however, that finding was, to a considerable degree, without support in the record. Still further, to the extent that there was any support for his finding that the jury acted to some degree out of passion, the judge also found that any such error "concern[ed] the jury's calculation of damages, not their finding on liability or the evidentiary basis for that finding," and that there was "ample" evidence to support their finding that Cumberland Farms was negligent and grossly negligent. Having made such a finding, with which we can find no error, it was within his authority to limit relief to the issue of damages. See *336 Simmons v. Fish, 210 Mass. 563, 568, 97 N.E. 102 (1912) ; Service Publications, Inc. v. Goverman, 396 Mass. 567, 576, 487 N.E.2d 520 (1986). See also Poly v. Moylan, 423 Mass. 141, 150, 667 N.E.2d 250 (1996) (ruling on new trial motion must stand absent error of law or abuse of discretion). *355 Conclusion. The amended judgment dated January 9, 2017, is affirmed.[32]
So ordered.

Because the decedent, her husband, and her daughter all share the same last name, we refer to each by their first name.

Skowyra had died by the time of trial. Most of the information regarding the course of travel of his SUV in the moments before the accident came from its "power control module" or "black box," which, every two-tenths of one second, recorded the SUV's speed, accelerator pedal pressure, and application of the brakes.

Skowyra was admitted to a hospital after the accident. His medical records, which were offered at trial by Cumberland Farms, reference a diagnosis of a stroke. The timing of the stroke and its connection to the accident, however, were not firmly established.

The security camera in the Chicopee store, which took a photograph every second, looked from the back of the store towards the front door and parking lot. The camera captured multiple images of Kimmy as she got out of the car driven by her husband, encountered Gladu at the front door, and went to enter the store. Given the speed of Skowyra's vehicle, however, the camera never captured an image of it as it crossed the parking lot and hit the store.

By the time of trial, Cumberland Farms no longer operated the Chicopee store.

A vehicle exiting a public way at a ninety-degree angle typically is traveling at eight to ten miles per hour.

As the plaintiff's traffic engineering expert testified, accidents occur in large numbers wherever public ways intersect as vehicles turn, cross paths, and come into conflict with one another. The presence of an apex entrance adds yet another point of egress and ingress at an intersection and significantly exacerbates those risks.

Car strikes that resulted in a motor vehicle fully penetrating a store building were sometimes referred to within Cumberland Farms as "drive throughs."

An uncontrolled vehicle had already penetrated the front of a Cumberland Farms store, pushing the checkout counter back several feet, striking and injuring an employee.

A video of the South Deerfield incident, captured by that store's security camera, was played for the jury in this case.

Both parties introduced evidence of the presence or absence of bollards at specific retail locations other than Cumberland Farms stores, but there was no evidence of any industry standard or practice.

Several months later, another car ran through the intersection in Norridgewock, but a newly installed guardrail prevented it from reaching store property.

Cumberland Farms received similar suggestions from its own employees. Each time an incident occurred at a store, employees were required to file a report, one section of which asked how to prevent a reoccurrence. Between 1997 and 2010, at least thirty-two reports were submitted suggesting that a car strike could have been prevented by the installation of some type of device or barrier (e.g., precast cement curb stops, bollards).

At least 337 of the incidents are described in such a fashion in the 2010 internal report, including: "Truck jumped curb. Hit front of building"; "Damage to front window. Caved wall structure in"; "Damage to door and moved building off foundation"; "Variety of damages ... Witness involved & sent to hosp[ital] via ambulance"; "Struck store front. Chipped bricks. Customer was drunk"; "Struck store front. Vehicle had no brake fluid. Driver was aware"; "Struck store front, entering store and car struck customer inside store"; "Struck store front. Elderly man hit gas instead of br[ake]. Damaged brick foundation and front windows"; "Struck store front. Customer drove into building. Hit building, trash barrel, safe, cigarette wall. Separated front of building from side of building. Ceiling and roof damage"; "Struck store front. Customer drove van through front of the store causing extensive damage"; and "Struck store front. Penetrated building causing extensive damage.

According to the 2010 internal report, there were fifty-nine Cumberland Farms stores that had at least some bollards in place.

For example, bollards were installed along the walkway at the South Deerfield store, but only after there was a second car strike at that location. Similarly, bollards were installed around the Hopkinton store after the 2009 car strike at that location.

Cumberland Farms suggests that the plaintiff's experts testified that it was possible that the bollards or other barriers would have prevented the Dubuque accident. In fact, they testified that it was possible to have designed bollards or other barriers that "would have" prevented the accident. They then identified those designs with specificity, discussing various types of typical bollards and the associated costs.

Cumberland Farms argues that, given the lack of testing or calculations to establish that the barriers would have withstood the impact of Skowyra's vehicle, there was insufficient evidence of causation. This is an attack on the weight, rather than the admissibility, of the plaintiff's expert evidence. The jury, however, could have found that, notwithstanding the lack of case-specific testing and calculations, the experts' opinions were credible given the background and experience they had designing, installing, and observing the performance of various bollards and other barriers. See Leibovich v. Antonellis, 410 Mass. 568, 573, 574 N.E.2d 978 (1991) (it is for jury to assess expert's credibility, considering, among other things, witness's knowledge and experience).

Cumberland Farms's expert witness testified that, while he had not been asked to do so, he too could have designed an array of bollards that would have prevented Skowyra's vehicle from reaching the store property through the apex entrance.

The bollards recommended by the plaintiff's mechanical engineer were more robust than those that Cumberland Farms planned to use as part of its new bollard program.

Cumberland Farms argues that the judge erred by declining to include in the jury instructions additional language which identified specific factors the jury could consider in determining whether prior car strikes were substantially similar (e.g., the size, mass, and speed of the vehicles involved, the cause and location of the accident, the injuries sustained). The judge left it to the parties to argue those factors to the jury, if they so chose. Because the circumstances of the previous strikes need "not replicate the exact circumstances of the plaintiff's accident," Santos, 430 Mass. at 203, 715 N.E.2d 47, the judge did not abuse his discretion in denying the request.

The report was also relevant to the jury's consideration of gross negligence and punitive damages. That is, the 2010 internal report was relevant to establish that Cumberland Farms "voluntar[ily] incurr[ed] ... an obvious risk and ... persist[ed] in a palpably negligent course of conduct over an appreciable period of time." Toczko v. Armentano, 341 Mass. 474, 481, 170 N.E.2d 703 (1960).

The judge apparently instructed the jury based on Santos, 430 Mass. at 204 n.12, 715 N.E.2d 47. We express no opinion regarding the instruction giving the jury the opportunity to reevaluate the threshold question of substantial similarity. See Mass. G. Evid. § 104 (2018). That portion of the instruction has not been challenged on appeal, and in any event favored the defense.

The question of foreseeability relates to both duty of care and proximate cause. See Whittaker, 418 Mass. at 198, 635 N.E.2d 1185. Other jurisdictions also look to the presence or absence of prior similar instances, area traffic patterns, and parking lot design in determining whether a duty existed. See Shoop's Restaurant v. Hardy, 863 N.E.2d 451, 455-456 (Ind. Ct. App. 2007) (no evidence of prior incidents; accident unforeseeable). See also Munford, Inc. v. Grier, 136 Ga. App. 537, 537-538, 221 S.E.2d 700 (1975) (accident foreseeable where defendant was aware of similar accidents at stores); Ray v. Cock Robin, Inc., 10 Ill. App. 3d 276, 282-283, 293 N.E.2d 483 (1973) (error not to admit evidence of prior accidents for purposes of jury's assessment of foreseeability of accident involving out of control vehicle); Skubovious v. Clough, 108 Ohio App. 3d 316, 320-321, 670 N.E.2d 578 (1996) (accident unforeseeable where no evidence of prior incidents); Zippy Properties, Inc. v. Boyd, 667 S.W.2d 312, 315 (Tex. App. 1984) (evidence of numerous occasions when cars ran into Zippy stores relevant to duty and negligence); Hendricks v. Todora, 722 S.W.2d 458, 464-465 (Tex. App. 1986) (no evidence of prior incidents; accident unforeseeable).

Cumberland Farms also argues that this was a wholly unique set of events, involving a one of a kind combination of high speed and medical emergency. However, the plaintiff's expert testified that the store was located in an area frequented by tractor trailers, and that a fully loaded tractor trailer traveling at the speed limit would have the same kinetic energy hitting a building as a Ford Explorer going at seventy miles per hour at the apex driveway. In other words, an unintended strike by a tractor trailer going at the speed limit would have had the same impact as the SUV here. The force of the impact was foreseeable, even if the precise events leading up to the impact were not known in advance.

In his instructions, the judge noted, "It is not necessary that Cumberland Farms have foreseen precisely the manner in which Ms. Kimmy Dubuque's death occurred, but it was enough that Cumberland Farms should have realized that there was a preventable real danger to its patrons." Cumberland Farms now contends that this instruction may have interfered with the jury's proper understanding of foreseeability. Having failed to object to this instruction before the jury retired to deliberate, however, Cumberland Farms waived this argument. See Mass.R.Civ.P. 51(b), 365 Mass. 816 (1974); Boston Edison Co. v. Massachusetts Water Resources Authy., 459 Mass. 724, 740, 947 N.E.2d 544 (2011). Still further, while the instruction could have been stated more artfully, the judge also instructed the jury that they were the sole finders of fact, nothing he had said or done should be taken to reflect his opinion about the case, and the burden of proof was on plaintiff.

The lack of prior car strikes at the Chicopee store did not mandate a finding that the risk was not foreseeable. See Whittaker, 418 Mass. at 199, 635 N.E.2d 1185 (foreseeability is not conclusively resolved simply because there were no prior occurrences).

See Rodriguez v. Del Sol Shopping Center Assocs., L.P., 326 P.3d 465, 471 (N.M. 2014) (when "a court begins to rely on factual details in deciding whether to modify the duty of ordinary care or exempt a defendant from that duty, the court is really determining that there has been no breach of duty"). See also Marshall v. Burger King Corp., 222 Ill. 2d 422, 443, 305 Ill.Dec. 897, 856 N.E.2d 1048 (2006) (when defendants seek to narrow duty of reasonable care to absolve them of liability, they are actually asking court to determine, as matter of law, that they did not breach duty of care).

The plaintiff argues that the judge should have considered the compensatory damage award in Evans v. Lorillard Tobacco Co., 465 Mass. 411, 464, 990 N.E.2d 997 (2013) (Evans ) (thirty-one year old son of fifty-four year old woman who died of lung cancer awarded $10 million in compensatory damages). As the judge noted, however, the plaintiff overlooked other, seemingly less favorable decisions. See, e.g., Aleo v. SLB Toys USA, Inc., 466 Mass. 398, 400, 995 N.E.2d 740 (2013) (husband and daughter of twenty-nine year old woman who died as result of defective pool slide awarded $2.64 million in compensatory damages); Williamson-Green v. Equipment 4 Rent, Inc., 89 Mass. App. Ct. 153, 154, 46 N.E.3d 571 (2016) (estate of man killed in accident on boom lift awarded approximately $3.7 million in compensatory damages). This comparison exhibits the problem with the approach the plaintiff advocates. One party may find an award that compares favorably; the other will find one that does not.

The plaintiff claims the judge erred by finding that $20 million was within the range of verdicts supported by the evidence, thereby suggesting it was less than the maximum justified amount. The judge made clear, however, that he remitted only so much of the $32,369,024.30 award as he adjudged to be excessive. See Clifton, 445 Mass. at 623, 839 N.E.2d 314.

With respect to other arguments presented by the parties not addressed herein, "they have not been overlooked. 'We find nothing in them that requires discussion.' " Central Ceilings, Inc. v. Suffolk Constr. Co., 91 Mass. App. Ct. 231, 242 n.20, 75 N.E.3d 40 (2017), quoting from Commonwealth v. Domanski, 332 Mass. 66, 78, 123 N.E.2d 368 (1954).